## THE STATE OF NEVADA, Respondent, *v.* JOHN MIL-LAIN, Appellant.

At common law a Grand Juror was not precluded from finding an indictment because he was either a witness or prosecutor.

Our statute fixes distinctly what shall be the disqualifications of a Grand Juror, and nothing else than what the statute prescribes can disqualify one from acting as such.

A prosecutor is "one who prefers an accusation against a party whom he suspects to be guilty." A party who appears in response to a subpœna is not a prosecutor, but only a witness.

A jury drawn whilst the Court was in session, in the presence of the Court and its officers, must be held to have been drawn in open Court, whether it was done in the room where the Court usually sits or in any other room of the Court House building.

A mere suspicion on the mind of a juror that the defendant is guilty does not disqualify him from sitting on a petit jury, especially if that suspicion mainly arises from the examination to which he is subjected by the prisoner's counsel touching his qualification as a juror. It is only an unqualified opinion that disqualifies.

"Unqualified opinion or belief" commented on.

The action of the lower Court in granting or refusing a change of venue is a matter of judicial discretion. If that discretion is abused it becomes the duty of an appellate Court to afford relief.

Two circumstances should influence a Court to grant a change of venue. One, the impossibility of obtaining a fair and impartial jury; the other, such a state of public excitement against the prisoner as would be likely to overawe and intimidate even a fair jury.

The fact that threats were made against the prisoner by parties who were not shown to have been either numerous or influential, was not sufficient to show there was danger of the jury being intimidated.

Where a defendant on his motion for a change of venue showed a state of facts strongly tending to the conclusion that he could not obtain a fair jury, it was not error in the Court to withhold its decision upon the motion until an examination was had of the jurors then in attendance, and being satisfied from such examination that a fair jury could be obtained, to refuse to make the order for change of venue.

The short form of indictment used in this case held to conform to the requirements of the statute.

That clause in the Constitution of the United States which declares "No person shall be held to answer for a capital or otherwise infamous crime unless on presentment or indictment," does not restrict the State Legislatures in prescribing the form of the indictment. It only requires that a Grand Jury should in some form express its approval of the prosecution before a party can be put on trial for such offense.

27

The State of Nevada v. Millain.

Under the statute of this State any indictment which is good to sustain the simple charge of murder, is equally good to sustain a conviction of the higher crime of murder in the first degree.

The Legislature has absolute power over the subject of criminal proceedings, and may prescribe such forms of proceedings, indictment, etc., as it sees fit, except in those particulars where its power is restrained by some clause in the State or National Constitutions. There is nothing in either of those instruments which can prevent the Legislature from enacting that a party indicted for sim ple murder may be found guilty of murder in the first degree.

Upon philosophical principles indictment for unlawful homicide should designate the grade of the offense committed, distinctly stating the facts which separate the offense charged from the next lower grade; but the Legislature may in its discretion dispense with all such distinctions, allowing a general indictment for unlawful homicide, and requiring the jury to find the grade of the offense in their verdict.

The fact that stolen property is found soon after the felony is committed in the hands of a party accused of the felony is some evidence of his guilt. But this proof may be greatly strengthened or weakened by the character, amount and value of the property; the circumstances, means, occupation, etc., of the defendant.

It is not error to charge a jury that they must find the prisoner guilty of murder in the first or second degree, or acquit, where there is no testimony offered which in any degree tends to show any fact or circumstances which could reduce the offense to manslaughter.

A charge in the following language if not correct is too favorable to defendant: "If you believe from the evidence that about the nineteenth day of January last, at Virginia, Storey County, the defendant with malice aforethought, either express or implied, and with deliberation and premeditation, did unlawfully kill Julia Bulette with intent to take her life, it will constitute murder of the first degree, and you should so find; otherwise you will acquit."

The common law rule that the possession of goods recently stolen shall be held as sufficient evidence to show that the accused is guilty, until he gives some explanation of that possession consistent with his innocence, is not weakened but rather strengthened by our statute allowing the accused to testify in his own behalf.

Where there is no testimony tending to show the defendant guilty of an offense of a lower grade than the one charged, it is not error to instruct the jury they must find the prisoner guilty as charged or acquit him. If however there is any testimony tending to reduce the offense to a lower grade, the whole question should be submitted to the jury.

A mere expression of opinion by the Judge about evidence is not error when the jury are distinctly told they are the sole Judges as to the facts about which the opinion is expressed.

The word "inferred," as used in instruction, is synonymous with "implied" as used in the definition of murder.

Length of time for deliberation is not an essential ingredient in murder in the first

degree. It is sufficient if the design to murder was formed before the striking of the fatal blow.

Where there is a preconceived design to commit some felony other than murder, and the result of the attempt, unintentional on the part of the felon, proves fatal to a human being, this premeditated felony would make *malice afore-thought* at common law. But this would not be willful, deliberate, premeditated killing under our statute, because of the absence of intent to take life.

he following definition of reasonable doubt is not erroneous : "By reasonable doubt is ordinarily meant such a one as would govern or control you in your business transactions in the ordinary pursuits of life." ·

When an instruction has been given by the Court in clear and intelligible language on any point in the case with all proper qualifications, it is not error to refuse to repeat the same instruction in detached parcels, not properly qualified and made applicable to the state of the evidence before the jury.

Per JOHNSON, J.—As the law formerly stood, six grounds of challenge were allowed to Grand Jurors. The three last were as follows : "Fourth, that he is a prosecutor upon a charge or charges against defendant; fifth, that he is a witness on the part of the prosecution and has been served with process, or bound by an undertaking as such ; sixth, that he has expressed a decided opinion that the defendant is guilty of the offense for which he is held to answer." The insertion of the fourth and fifth clauses shows a distinction was taken between witness and prosecutor. The amendment of the law by striking out fifth and sixth clause, cannot be held to have added anything to the scope and effect of the fourth clause.

Even under the former law the objection would have been insufficient. The witness did not show that he had formed a *decided* opinion of prisoner's guilt. Neither is it shown that he was subpœnaed or otherwise bound to appear as a witness for the prosecution, nor in fact does it appear he was sworn as a witness for prosecution.

A challenge to the panel of trial jurors must be in writing, specifically stating the grounds of challenge or other facts on which the challenge is based.

Can this Court reverse a judgment in a criminal case because the evidence is *insufficient* to sustain the verdict? If there be any evidence, does it not become a matter of fact and not of law merely ?

Dissenting opinion, per LEWIS, J.

It is error for a Judge to give his opinion to the jury as to the weight or sufficiency of testimony. In a trial for murder a Judge should not give it as his opinion to the jury that they should find the prisoner guilty of murder in the first degree, or acquit. The grade of the offense is a question of fact which should be left entirely to the jury.

When a killing has been shown, the presumption arises that a murder has been committed. But there is no presumption that it is murder in the first degree in a case of this kind. If the defendant claims that it is only manslaughter, the proof devolves on him to show the circumstances, thus reducing the grade of offense. If the prosecution claims that it is murder in the *first degree*, it devolves upon the State to show the aggravating facts.

An instruction in the following language is erroneous : " The testimony in this case tends to show the property of the deceased, or some portion of the same, in the possession of the defendant at a time subsequent to the alleged murder, and at quite a recent date." This instruction assumes that the property found was, or had been the property of deceased. The expression " tends to prove" only applies to the tendency of the evidence to show when the property was found, but does not apply to questions of ownership.

. THIS was a trial for murder in the First Judicial District, Storey County, Hon. RICHARD RISING, presiding.

The facts are fully stated in the opinion of the Court.

*C. E. DeLong*, for Appellant, filed a brief which, owing to the importance of the principles involved and the interest felt by the community in this case, we here insert without alteration, except that the preliminary statement of facts is omitted — the same appearing in the opinion of the Chief Justice.

" It is good cause of exception to a grand juror, that he has formed and expressed an opinion as to the guilt of a party whose case probably will be presented to the consideration of the grand inquest." (*People* v. *Jewett*, 3 Wend. 313 ; citing 6 Wend. 386 ; Wharton Am. Crim. Law, 120 ; 6 Serg. & Rawle, 395 ; Burr's Trial, 38.)

" By the common law the grand jurors are to be *good and lawful* men—that is, men free from all objections, and who might serve as petit jurors in the case." (See 1 Chitty Crim. Law, 307.)

" There exists the same right for challenging for favor the grand jury as the petit jury." (1 Burr's Trial, 38.)

By statute of this State of 1866, p. 49, challenges to individual grand jurors are limited to four, provided that act be constitutional. The fourth subdivision of that statute reads as follows :

" That he is prosecutor on a charge or charges against the defendant." The question for consideration is : What did the Legislature mean by the term " prosecutor " ? It is quite clear that they did not mean the people of the State, in whose name all criminal proceedings are prosecuted, nor the prosecuting attorney of the county ; but did mean such person or persons upon whose evidence the prosecution was to be based.

There is no reason in the position that any one person, who is to be called as a witness for the State, should be allowed on the grand jury any more than another; hence the statute means, if it means anything at all, to exclude all that class of persons from sitting on a grand jury during the investigation of a case in which they are, or expect to be, witnesses for the State.

D. Black, the grand juror in this panel challenged, clearly comes within the rule; hence the Court erred in not allowing the challenge of this juror.

The common law authorities do not distinguish between causes of challenge to grand or petit jurors. (5 Bacon's Abridg. 353.)

II. The Court erred in not sustaining the defendant's challenge to the panel of trial jurors, as the names were not put in the box and drawn in open Court as required by law. (Statutes of 1866, Sec. 6, p. 192.)

III. The Court erred in refusing to allow the challenges interposed by the defendant for implied bias to the jurors' named, respectively: D. Black, B. Potter, J. Monahan, L. E. Morgan, L. Alexander, and L. D. Young. (Stat. 1861, p. 470, Sec. 340; 6 Cowan, 562, *ex parte* Vermilyea; *People* v. *Gehr*, 8 Cal. 362; *People* v. *Reynolds*, 16 Ib. 132; *People* v. *Woods*, 29 Ib. 636.)

IV. The Court erred in refusing to grant a motion for change of venue. (Stat. 1861, p. 407, Secs. 306 and 308.)

This statute is a literal copy of the California Act, and has been construed by the Courts of that State to vest the Court with a reasonable discretion in the premises; an abuse of that discretion is error. (*People* v. *Mahoney*, 18 Cal. 186.)

" The Court's discretion is to be exercised within well established legal rules. It is a sound and equitable, and not an arbitrary discretion, it is required to exercise." (*People* v. *Vermilyea*, 7 Cowen, 398; Graham & Waterman on New Trials, 1001; *People* v. *Webb*, 1 Hill, 182.)

We challenge the examination by the Court of the affidavits filed in support of this motion, and the admissions of record connected therewith made by the prosecuting attorney, by the light of the authorities which we have cited; and with all due respect we assert as a fact, that the books will fail to furnish a parallel case where

the motion has been refused and the action of the Court sustained.

We especially call the following fact to the attention of the Court, to wit:

*No counter showing was made upon this motion, therefore all matters averred in support of it, and admitted in connection with those averments are to be taken strictly as true.*

There can be no doubt but that the Court upon the appeal possesses a revisory power over the action of the Court below in this matter. (*People* v. *Lee*, 5 Cal. 353; 5 How. Pr. 25.)

V.   The Court should have sustained the demurrer to the indictment in this action.

We respectfully insist that the indictment is insufficient to warrant or sustain a conviction for felony, wherein it fails to charge Julia Bulette was a human being, or in the peace of the State at the time of the killing, or that the defendant did the act with malice aforethought, express or implied. It does not contain a statement of acts constituting the offense, or the particular circumstances of the offense charged. (Practice Act, 234–6, 286, 430, 431 and 433.)

The indictment should state the facts upon which the prosecution relies, so that the accused may be prepared for his defense. (6 Cal. 236 and 208; Chitty's Crim. Law, 172, 228, and 281; Wharton's Crim. Law, 873; Bishop's Crim. Law, 332; 9 Cal. 31 and 54.)

A party indicted must be brought within the very letter of the Statute. (2 Barber on Crim. Practice, p. 547; Heydon, Case 4, Co. A.)

"The following averment," says Barber, "is one of the substantial averments: '*In and upon one E. F.*'" (Page 54, Sec. — Barb. C. Prac.; see also, Form of Indictment for Murder, Sec. 541, Id.)

It will be seen that this contains an averment equivalent to charging that it was a human being. The reason why the term "human being" is not embraced in Common Law indictments for murder is because the Common Law definition of murder does not contain the term "*human being*." (1 Archbold, 831.)

The State of Nevada *v.* Millain.

The difference between the Common Law definition and the statute definition is this: at Common Law the term "*a reasonable being alive*" is used, instead of the term "*human being*" which is in our statutes; hence the Common Law indictments mention the term " did live." (2 Bishop Cr. Prac. 543.)

As counsel, we feel safe in saying that no precedent at law or in practice can be found to justify omitting in an indictment for murder the averment that it was "*willfully and maliciously done.*" (*State* v. *Fouts*, 4 Green, [Iowa] 500; 23 U. S. Dig. 289.)

We doubt that our statute means (critically reviewed) to warrant the averment; but if it is so intended we dispute its constitutionality and binding force, for the reason that murder being an offense at Common Law, *the offense must be set out fully as at Common Law.* (1 Bishop Cr. P. Sec. 348; *People* v. *Enoch*, 13 Wend. 159.)

Technical terms used in a statute must always be set forth in an indictment; but setting them forth alone is not always sufficient. (1 Bishop Cr. P., Sec. 373.)

The indictment must charge *an intent to kill*. (10 Ohio [N. S.] 459 and 598; 21 U. S. Dig. 283, Sec. 14; 2 Bishop Cr. P., Sec. 280.)

VI. The Court erred in refusing the motion in arrest of judgment and for a new trial, as the indictment did not charge the crime of murder in the first degree, and did not warrant the verdict rendered in this case and the judgment pronounced thereon.

Murder in the first degree is defined by our statute to be " all murder which shall be perpetrated by means of poison, or lying in wait, torture, or by any other kind of willful, deliberate, *and* premeditated killing, or which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, or burglary, shall be deemed guilty of murder of the first degree; and all other kinds of murder shall be deemed murder of the second degree."

Now as this indictment fails to charge this defendant with having committed the crime of murder by means of poison, or lying in wait, or torture, or in the perpetration or attempt to perpetrate any arson, rape, robbery, or burglary, and inasmuch as the indictment fails to charge him with any willful, deliberate, or premeditated

killing, or that it was feloniously done, we hold that it is self-evident therefrom that it does not charge the defendant with the crime of murder in the first degree.

Section 8 of Article I, State Constitution, and Article V amendments to the Constitution of the United States, provide that no person shall be tried for a capital or other infamous crime, unless on a presentment or indictment of a Grand Jury, etc. These words were used by the framers of those instruments in their common law sense; hence the Legislature of our State has no power to provide that an indictment shall be other than what the common law says is an indictment. For definition of Indictment at common law, see 1 Bouv. L. Dic. title "Indictment;" 2 Bishop Cr. P. Secs. 562–597, inclusive; 23 U. S. Dig. 289, Secs. 6, 7, 8 and 9, citing 4 Green's [Iowa] 500; 1 Wharton Am. Cr. Law, 400; Chitty Cr. Law, 242 and 3. The words "malice aforethought" do not signify that the person killing meant to kill. (2 Bishop Cr. P. 592, 561; 2 Bishop Cr. Law, Sec. 742.) The words "malice aforethought" do not embrace the words in substance "deliberate and premeditated." (23 U. S. Dig. 289, Sec. 9; Secs. 234 and 236 Criminal Practice Act, Statutes 1861, 460 and 461.)

VII.   The evidence in this case being wholly circumstantial, did not warrant the verdict. Taking all the evidence as true, and but one fact was established beyond a reasonable doubt in the case, and that fact was, that the defendant was found in possession of some of the property of the deceased.

For the sake of argument now, taking as correct, without qualification, the rule laid down by Greenleaf in his work on Evidence, Vol. III, Sec. 31, embodied by the Court in its charge to the jury in this case, (pp. 125 and 6) and tried by that rule, we propose to show the verdict was unwarranted, and the Court erred in not arresting the judgment and granting a new trial.

It must be admitted under the rule above cited, the mere possession of the goods of the deceased, uncorroborated by any other evidence tending to show the defendant's guilt, is in itself insufficient to warrant a verdict.

Now, by the light of the rule above quoted, let us examine and

see what other facts and circumstances it was necessary for the prosecution to establish in order to warrant the verdict in this case. And then let us farther examine and see if such facts or circumstances were proven.

The rule says : In connection with possession it behooves the prosecution to add other proof " such as the previous denial of the possession by the party charged, or his refusal to give any explanation of the fact, or giving false or incredible accounts of the manner of the acquisition, or that he has attempted to dispose of it, or to destroy its marks, or that he has fled or absconded," etc.

An examination of the record will show that there is not one scintilla of testimony tending to prove either of these circumstances, except the one of his attempted disposition of the goods. He neither refused to give an explanation of his possession ; nor did he give any false or incredible account of the manner of his obtaining them ; nor did he attempt to destroy any marks upon them ; he did not flee or abscond.

Now we take it for granted that it is a correct rule that a circumstance proven to have occurred, which tends to prove the innocence of the party accused, must be allowed to weigh as strongly in his favor as it would be allowed to weigh against him if tending to prove his guilt.

In other words, if evidence tending to show that this defendant after this murder fled or attempted to flee would be evidence of his guilt, certainly the evidence of his remaining would tend to prove his innocence. And we also contend for the rule that where one circumstance is proven which tends to show guilt, and another which tends to show innocence, they should be weighed one against the other, and both be given due consideration.

In this case the circumstance of the attempted disposition of the goods by the defendant, to our minds tends rather to prove the innocence than the guilt of the defendant in this case, he having attempted to make such disposition of the goods in this community.

Indeed, the whole circumstances in this case exclusive of the possession of the property indicate insanity or innocence, rather than sanity or guilt. That this defendant should have remained in the community where he had committed such an atrocious

crime, when there was no obstacle to his flight, and kept in his possession the only evidence of his guilt concealed only in an insecure trunk, and that kept in a room where all had access, in a public building, covered with a cloth upon which was his own name in indelible ink ; the disposing of the dress-pattern in Gold Hill, his attempted disposition of it in a house of ill-fame in the same place, where he might have reasonably anticipated it would have been recognized, that house being frequented by the consorts and companions of the deceased ; his sale of the diamonds at the leading jewelry store in the City of Virginia; and his pledging the deceased's watch at a pawn-broker's in the same town, leaving it within a stone's throw of the identical place where the murder was committed, and leaving it unredeemed, with the knowledge that it would be placed in a public window for sale ; form a combination of circumstances that irrresistibly leads the mind to the conclusion, either that John Millain was a fool or insane, or that he was the dupe of the real murderer, and that without knowledge other than that the goods were perhaps improperly obtained, to share in the fruits he was induced by the real murderer to take charge of and attempt to dispose of the same.

Such evidence is certainly far from sufficient to satisfy the unbiassed mind that John Millain was the murderer of Julia Bulette. It certainly entirely fails to exclude any other reasonable hypothesis than that of the defendant's guilt; on the contrary, all of the circumstances proven may be true, and the defendant not only possibly but probably innocent.

VIII. We now come to a consideration of that portion of this case which furnishes us in our judgment with an undoubted right to a reversal of this judgment.

The subject to which we allude is, the charge of the Court to the jury, and its refusal to give certain instructions asked by us.

The charge is insufficient within itself as a whole—inconsistent and illogical in detail—pregnant with errors of law, and a usurpation of power in usurping the functions of the jury in instructing them in matters of fact.

We here extract several portions of the charge, and present them to this Court in proof of our assertions.

In the charge the Court uses this language : " Your verdict must be in writing, guilty of murder in the first degree as charged in the indictment, or guilty of murder in the second degree, or not guilty." (See Record, 128.)

In another portion of the charge this language occurs :

" If you believe from the evidence, that about the nineteenth day of January last, at Virginia, Storey County, that the defendant with malice aforethought, either express or implied, and with deliberation and premeditation, did unlawfully kill Julia Bulette, with intent to take her life, it will constitute murder of the first degree, and you should so find ; *otherwise you will acquit.*" (See Record, 128.)

In another place the Court uses this language in its charge :

" If you believe the defendant guilty of an offense, and doubt as to the degree, you can only convict of the lowest degree of crime within the grade of the one charged, *murder in the first or second degree.*" (See Record, 124.)

Here we have an array of palpable errors of law, for in direct terms the jury are instructed in one place that manslaughter is not a crime in the grade of murder, and not included in an indictment for murder. That this is error, see *People* v. *Dolan,* 9 Cal. 583 ; 2 Bishop's Crim. Pr. 584 and 590 ; 10 Ohio N. S. 459 ; 21 U. S. Dig. 284, Sec. 40.

Under this charge the jury were precluded from finding a verdict for manslaughter, and even of murder in the second degree.

The force of this instruction was to direct the jury to send the defendant to the gallows, or the street ; all other alternative was denied the jury if they obeyed the charge.

The defendant left to the terrible stake of death or liberty, with no hope of the latter.

Degree is a question of fact. (*People* v. *Belencia,* 21 Cal. 544.)

The Court also erred in giving the following instruction unexplained :

" In the first place, if the fact of possession stands alone, wholly *un*connected with any other circumstances, its value or persuasive power is very slight ; for the real criminal may have artfully placed

the articles in the possession or on the premises of an innocent person, the better to conceal his own guilt.

" It will be necessary for the prosecutor to add the proof of other circumstances indicative of guilt, in order to render the naked possession of a thing available to a conviction; such as the previous denial of the possession by the party charged, *or his refusal to give any explanation of the fact, etc.*" (See Record, 126.)

This language unexplained led the jury to conclude that the defendant's failure *to testify and explain* these things when the law held out to him an opportunity to do so, accompanied by proof of the possession, would warrant them in finding a verdict of guilty. Thus unexplained it fairly overcame that portion of the charge where they were instructed that the failure of the defendant to testify should not be considered by the jury as an evidence of guilt. This made the charge self-contradictory, and it is fairly inferable the jury were misled by it, and under it were induced to find the defendant guilty from his failing to testify. However correct such doctrine may be at common law, it is clearly inapplicable under our statute, and that it did the defendant in this case gross injustice there can be no doubt.

In another place in the charge the Court uses this language :

" It devolved upon him to explain and account for such possession by him, etc."

Now we ask, what other construction would the jury give to this language than that the Court meant to instruct them that it devolved on the defendant *to explain on the stand, as a witness,* how he became possessed of these things.

This charge in many portions is violative of Art. VI, Sec. 12, of our State Constitution, which provides that " Judges shall not charge juries in respect to matters of fact, but may state the testimony and declare the law." (See also Stats. 1864–5, 113, Sec. 23—to same effect.)

We call attention to the following portions of the charge :

" The testimony in this case tends to show the property of the deceased, or some portion of the same, in the possession of the defendant, at a time subsequent to the alleged murder, and at a quite recent date," etc. (125.)

Also in another portion of the charge, this language occurs:

" The distinction between murder of the first or second degree is quite nice. I will briefly state such distinction, although from the testimony I apprehend you may conclude that the defendant was either guilty of murder of the first degree, or innocent." (123.)

Now we submit, that we here find the Court in its charge informing the jury what is proven, and instructing them relative to the degree of crime of which they should find the defendant guilty under the indictment ; for it is an axiom of the law that it will not permit that to be done indirectly which it forbids to be done directly. (*People* v. *Ybarra*, 17 Cal. 170, 171 ; *People* v. *Gibson*, Id. 284, 285 ; 20 U. S. Dig. 481, Secs. 126, 134 ; 21 Id. 284, Sec. 40.)

The following portion of the charge is erroneous :

" Murder of the first degree consists of a willful, premeditated, unlawful killing. The intent to kill must exist. This intent may be inferred from the circumstances."

The error herein consists in giving a wrong definition to the course of murder in the first degree, and in the use of the term " inferred." (See. 21 Cal. 546.)

Another error in the charge is, in the use of the following language :

" This intent need not have existed for any given length of time before the killing. It is sufficient, the killing being unjustified or unexcused by the circumstances, if it be formed at the instant of killing." (4 Green, Iowa, 500 ; 23 U. S. Dig. 290, Sec. 23 ; 1 Park Crim. 347 ; U. S. Crim. Dig. 326, Sec. 580.)

Also the following portion of the charge was erroneous :

" By reasonable doubt is ordinarily meant such a one as would govern or control you in your business transactions or the usual pursuits of life." (*Jane* v. *Commonwealth*, 2 Met. 30 ; 20 U. S. Dig. 482, Sec. 142.)

The Court also erred in refusing to give the instructions asked for by the defendant in relation to the weight to be given to the proof of his having in his possession the goods of the murdered woman.

The instructions clearly state the law, and there is no justification in the reply that the same law was substantially stated in the charge. (*People* v. *Ramirez*, 13 Cal. 172.)

In conclusion, we have simply to state that, although it may be true that the defendant in this case is a murderer, is it likewise true that he has been legally convicted ?   And we present his case to this Court, reddened as he may be by blood, with a firm conviction that this Court will yield to no popular clamor, but will intelligently and justly administer the law in this case as in all others, which being done, we feel confident the Court must award a new trial.

*Pitzer*, for Respondent, filed the following brief:

The first objection to the record is the challenge to the grand juror D. Black, for bias against the defendant.

The objection is not well taken.   (See Statute 1866, page 49, Section 180.)

As to the challenge to the panel: it does not specify the grounds of the challenge, neither was it in writing.   (See Statute 1861, page 468, Section 324.)

The demurrer was properly overruled by the Court below.   The indictment strictly conforms to Statute 1861, pages 459 and 460, Sections 234 and 235, as amended by Section 6, page 126, Statutes 1867.

The objection as to the killing of a human being is refuted by charging the defendant with murder.   For definition of " Murder," see Statute 1861, page 68, Section 15.

The third point of error relied on is the overruling of the motion for a change of venue.   The error is not well assigned ; it being a discretionary power of the Court will not be reviewed upon appeal, except for gross abuse, which does not appear to be the case in this instance.

The fourth error assigned is not well taken : First, because the objection was oral.   (See Statutes 1861, p. 468, Sec. 324.) Secondly, the objection does not point out the error relied on.  ·

The fifth error assigned—challenge for implied bias—is not well taken : First, the objection to D. Black, B. Potter, J. Monahan, L. E. Morgan, L. Alexander and L. D. Young, is upon the ground that they had formed or expressed an opinion or belief touching the guilt or innocence of the defendant.   The evidence of said jurors,

as appears of the record, shows that they had not formed an unqual-ified opinion or belief that the defendant was guilty or not guilty, and therefore the challenges for implied bias were properly over-ruled.   (See Statutes 1861, p. 470, subd. 8 of Sec. 340; also *The People* v. *Reynolds*, 16 Cal. 128; *People* v. *Vermilyea*, 7 Cowen, 121 and notes.)

The sixth error assigned is not well taken.   The instructions of the Court conform to law, and do not instruct as to facts.

The first and third instructions asked by defendant's counsel are embodied in the instructions given by the Court.

The second and fourth instructions offered by defendant's counsel were properly refused by the Court, not being law.

The Attorney General also argued the case orally for the Respondent.

Opinion by BEATTY, C. J.

This is a case of conviction for murder in the first degree.   The several grounds of error which the appellant assigns we will notice *seriatim.*

The first point made is, that the Court below erred in failing to sustain his challenge to a grand juror named D. Black.   Black, on an examination touching his qualification as a grand juror to act in this case, said substantially that he had heard of the charge against the prisoner, and had formed an opinion touching his guilt or in-nocence ; that perhaps he might be called as a witness in the case to identify a certain piece of property as having belonged to deceased ; that he was not a prosecutor in the case.   The defense objected to the grand juror participating in the examination of the charge against him, for two reasons : First, because he was a witness for the pros-ecution ; and second, because he had already formed an opinion as to his guilt or innocence ; and upon the ruling of the Court that Black was a competent juror to investigate the charge and join in finding an indictment, excepted.

In argument it is contended that defendant was just as much entitled to an impartial grand jury in making the preliminary exami-nation on which the indictment was found, as to an impartial jury

to try the charge after it was made.   In support of this proposition
we are referred to several authorities.   The opinion of Chief Justice
Marshall in the Burr trial is perhaps the authority entitled to most
weight on this point.   We have no copy of Burr's trial in this place,
and there is none in the State that we are aware of.   We cannot,
therefore, have the means of ascertaining the grounds on which that
great jurist based his opinion.   But as the Congress of the United
States have never, so far as we are aware, passed any law touching
the qualification of grand jurors, we presume the opinion or ruling
in that case must have been based either upon common law princi-
ples or upon the ground of natural justice.   This latter ground was
probably the one on which the Chief Justice acted.   In the case of
*The People* v. *Jewett*, 3 Wendell, 313, the New York Court seems
to have followed the rule laid down by Marshall; or to speak more
accurately, say they would have followed the rule if the objection to
the grand juror had been interposed at the proper time.   These are
the only cases we find supporting such an objection to a grand juror,
except in those cases where there is some statute authorizing a party
accused to interpose a challenge to grand jurors on account of bias.

When the ruling of Chief Justice Marshall in the Burr trial was
called to the attention of the Supreme Court of Massachusetts, that
Court not only refused to be governed by it, but expressed their
strong disapproval of the case, and thought it the only case of the
kind to be found in the books.   They refused to remove a prose-
cutor from the panel of a grand jury before whom a capital case was
to be investigated.   (See Tucker's case, 8 Mass. 285–6.)

We think at common law a grand juror might be the prosecutor,
the only witness in the case, and still participate in finding the bill.
(See Wharton's Criminal Law, Sections 453 to 458, and notes.)
But whatever may have been the rule at common law, or whatever
the principle of natural justice, our statute fixes the disqualifications,
and the only disqualifications, of grand jurors.   The Statutes of
1866, p. 49, amending a former Act, provide that " a challenge to
an individual grand juror may be interposed for one or more of the
following reasons, and for no other: First, that he is a minor ; sec-
ond, that he is an alien ; third, that he is insane ; fourth, that he
is the prosecutor upon a charge or charges against the defend-
ant."

The State of Nevada *v.* Millain.

It is not pretended that this grand juror is shown to have labored under any of the disqualifications here mentioned, except as to that of being a prosecutor. We cannot conceive that there is anything in the record tending to show that he was a prosecutor. Bouvier defines a private prosecutor to be " one who prefers an accusation against a party whom he suspects to be guilty." This is a very correct definition, and certainly is not broad enough to include a mere witness in the case, who is not shown to have taken any part in setting a prosecution on foot. A party who voluntarily makes an affidavit to procure the issuance of a warrant to arrest a party whom he accuses of crime is properly a prosecutor. So too a party who voluntarily procures permission to be sworn and go before a grand jury to testify as to any alleged crime, may be held to be a prosecutor. But a party who merely appears in response to a subpœna issued at the instance of the grand jury or the prosecuting attorney, cannot be held or treated as a prosecutor. He is merely a witness, and nothing more. We see no valid objection to the grand juror.

The second assignment of error is in this language :

" The Court erred in not sustaining the defendant's challenge to the panel of trial jurors, as the names were not put in the box and drawn in open Court, as required by law." And the part of the statement in support of this error is as follows : " The Clerk of said Court, in drawing the names of said seventy-five jurors from said jury box—pursuant to the order therefor—drew the said seventy-five names from the jury box in the Clerk's office, in the presence of the Judge of the Court."

Whilst this statement shows that their names were drawn from the jury box in the Clerk's office, it does not show that they were not drawn in open Court. The Court may have been in session in the Clerk's office. The Clerk's office and court-room may have been one and the same, or being in the same building, they may by the opening of a door or the throwing open of a partition, have been all thrown into one room. There is not sufficient in the record to show what were the real circumstances of the case. If the drawing took place whilst the Court was in session, and in the presence of its officers, consisting of Clerk, Sheriff, attorneys of the Court, etc., it must be held to have been done in open Court, whether in the

28

room where the Court ordinarily transacts its business or any other room in the same building. The record does not affirmatively show error.

The third ground of error is the refusal of the Court below to sustain the appellant's challenge to several jurors for implied bias. Perhaps the strongest case made by appellant on this assignment is the one shown by the examination of D. Black. We will give the most material portions of his examination:

*Question.* This spring or summer did you read of the apprehension of Millain? *Answer.* I read of the apprehension and·imprisonment; the name I could not tell. I think I heard of it, too.

*Q.* Did you read the newspaper accounts about the finding the property of the deceased—the silk dresses, the furs, the jewelry, etc., found at the bakery in his trunks? *A.* I could not say positively whether I heard it or read it. I either heard of it or read of it.

*Q.* Have you conversed with any person about this man? *A.* No; I have heard others when I was passing by.

*Q.* You have heard others express opinions as to whether he was guilty or not? *A.* I have heard many.

*Q.* Have you heard persons express opinions about it in whose judgment you place confidence? *A.* I place confidence in no man's judgment.

*Q.* No confidence in any man's judgment? *A.* No one.

*Q.* You place confidence in your own? *A.* Sometimes.

*Q.* Did you read an account published in the newspapers about this man's admitting to the Chief of Police he was guilty? *A.* I rather think I have been told that part of it. I might have read it.

*Q.* Did you believe it when you read it? *A.* I could not say I believed it.

*Q.* Did you believe it this far: would you believe it from now on if you should hear it disputed—would your belief tend rather to its truth than its falsity? *A.* Yes, that much it would.

*Q.* I ask you if, from reading an account that the defendant had confessed his guilt—if from reading that he had been found with the goods in his possession, and that he had confessed he was guilty—any feeling of bias or prejudice against him was engendered in your mind? *A.* No prejudice in my mind.

*Q.* Does he occupy the same place in your opinion as any other man in the community ? *A.* Well, I would rather keep him at a little distance.

*Q.* Why would you rather keep him at a distance ? *A.* Well, it is more or less prejudice.

*Q.* Have you a feeling of bias or prejudice against this defendant arising from evidence that you believe ? *A.* I have never formed or expressed an opinion as to his guilt or innocence.

*Q.* Have you an impression he is not guilty ? *A.* Whatever impression I have is against him.

*Q.* You have an impression against him ? *A.* To a certain extent.

*Q.* Would it require evidence to remove that impression ? *A.* It certainly would.

*Q.* So that impression is a belief ? *A.* Yes.

*Q.* It would require evidence to remove it ? *A.* Yes, sir.

Mr. DeLong challenges the juror for implied bias.

*Mr. Pitzer*—If you are asked the question if you believe or have an opinion in your mind whether this defendant is guilty or innocent, could you say Yes or No ? *A.* I would not say either— either that he was or was not.

*Q.* Your mind is in such a state that you cannot believe he is either guilty or innocent ? *A.* Exactly.

*Q.* How often have you seen the defendant ? *A.* I never saw him before I saw him in Court. I have heard more in Court to-day than I have heard before.

*Q.* Did that create a bias or prejudice against him ? *A.* It certainly made more or less.

*Q.* Did you have any feeling or prejudice against him before that ? *A.* Not before I came into Court ; not a particle before I came into Court.

*Q.* Do you feel that, laying everything else aside, you could give this defendant a fair and impartial trial upon the evidence alone ? *A.* I would just pass upon it the same as I would anything else, if I did not know anything about the case.

*Q.* You say you have no opinion as to whether this defendant killed the woman or not ? *A.* I have not.

*Q* Upon that subject you have no opinion? *A.* No, none. Prosecution denies the challenge.

*By the Court.*—Does that opinion you have relate to the question of the guilt or innocence of the defendant? *A.* Well, what I have heard in Court to-day would be a belief.

*Q.* Merely what you have heard in Court to-day—does it arise from that? *A.* That is all; about the goods being seen in his possession, that brought me to my belief.

*Q.* Have you any prejudice against the defendant by reason of this indictment? *A.* Not a particle.

*Q.* Do you entertain an opinion as to the guilt or innocence of the defendant that would require evidence to remove, from what you have heard to-day? *A.* Well, it would take some, no doubt.

*Q.* Could you give this man a fair and impartial trial, setting aside all you have heard to-day, and try him according to the law and evidence? *A.* Certainly I could, according to the law and evidence.

*By the Court.*—I think he is a competent juror.

The only ground of implied bias claimed by the appellant to have been shown in this case is one which comes under the eighth division or class of causes which the statute says shall be evidence of implied bias. This eighth division reads as follows: "Having formed or expressed an unqualified opinion or belief that the prisoner is guilty or not guilty of the offense charged."

These answers are somewhat contradictory, but in our opinion do not show any disposition to conceal the opinions or views of the juror. They rather show that the juror was sometimes rather inaccurate in the use of the English language. They further show that from what the witness had heard before he came into Court he had formed an impression that the prisoner was probably guilty, and that impression was somewhat strengthened by what he had heard the prisoner's counsel say in the course of his examination about prisoner having been found in possession of goods of deceased. And before that suspicion or impression could be removed he would have to hear some exculpatory evidence from the other side. If a mere suspicion of this sort were sufficient to exclude a juror, we do not see how any juror of common intelli-

The State of Nevada *v.* Millain.

gence could serve in any given case when the defendant wished to exclude him.  A juror being called up and informed that a party in Court has been indicted and stands charged with a certain offense, (if he has heard nothing of the case before) naturally has his suspicions aroused that the party may be guilty, else he would not likely have been indicted.  If in addition to this the prisoner's counsel asks if he has not heard or read of certain suspicious circumstances connected with his client's conduct, this suspicion, however slight at first, is thereby naturally increased.  Indeed, we can scarcely conceive of a case where an impartial juror could be sworn to try one charged with a grave offense without some suspicion resting in his mind that the prisoner was guilty.

A mere suspicion is not enough to disqualify a juror; it must be a fixed and positive opinion: in the words of the statute " an unqualified opinion or belief."  What it takes to constitute " an unqualified opinion or belief," it is sometimes very difficult to determine.  Perhaps as good an exposition of the technical meaning of this phrase is to be found in the opinion of Mr. Justice Baldwin in the case of the *People* v. *Reynolds*, 16 Cal. 132, as could well be given.  From that opinion we quote one paragraph which expresses our views more clearly than we ourselves could express them: " Among the causes of implied bias, is the having formed or expressed an unqualified opinion or belief that the prisoner is guilty, or is not guilty of the offense charged.  (Wood's Dig. 296, Sec. 347.)  Upon no one question of civil or criminal practice have the decisions of Courts been more inharmonious than upon this question of qualification or disqualification of jurors, arising from the formation or expression of opinion of the guilt or innocence of the accused.  We are relieved to some extent of the task of determining the question upon its original merits, for our statute was designed to fix a rule upon this subject.  It makes the formation or expression of an unqualified opinion or belief a ground of exception to the juror for implied bias.  The only difficulty is to fix the meaning of these terms, ' unqualified opinion or belief.'  Evidently these terms were used to define the nature of the opinion or belief formed or expressed; to distinguish between a mere hypothetical opinion, or a mere casual impression, and a decided or fixed opinion.

The language implies that, to exclude the juror, he must have a settled conviction of the guilt or innocence of the party, or has expressed such a conviction. It does not seem to be indispensable, under this section, that the juror has had the usual, or any means, or opportunities, of arriving at a correct or intelligent opinion upon the subject, if he has formed it or if he has expressed it. Minds are so differently constituted that some men form opinions and very obstinately adhere to them upon slender and insufficient grounds, while others are undecided when sufficient reasons exist for forming them. The statute fixes a standard of its own by which impartiality is approximated as nearly as possible consistently with the effective administration of criminal law. It has declared a test of exclusion for implied bias to be, that the juror has formed or expressed ' an unqualified opinion.' We must hold this rule in its simplicity, neither subtracting from it nor adding anything to its requirements. If, for example, the juror has read or heard a statement of the facts of a case, this does not of itself, under the section, disqualify him, for it does not follow that he has either formed or expressed ' an unqualified opinion.' He may not have formed any opinion at all, certainly not an unqualified one. He may have received an impression, but this impression is not enough to disqualify him. A mere suspicion or inclination of the mind toward a conclusion is not enough ; the state of the mind must be more decided. He must have reached a conclusion like that upon which he would be willing to act in ordinary matters. In other words, we repeat, the effect upon his mind must be more than an impression ; it must amount to a conviction in order to exclude him for implied bias."

But even with this explanation, as clear and precise as the nature of the subject will admit of, we cannot but admit that many causes might arise where the shades of opinion would be so nice as to render it impossible to arrive at a satisfactory conclusion as to whether the opinion formed by a juror was " an unqualified opinion." Suffice it to say we do not think this juror, or any of the other jurors challenged for implied bias and permitted by the Court to sit in the case notwithstanding the challenges, had formed " an unqualified opinion or belief."

The State of Nevada *v.* Millain.

The fourth assignment of error is, that the Court below erred in refusing to grant a change of venue. This motion was founded on three affidavits, and the admission of the District Attorney of certain facts. The substance of these affidavits was as follows: Defendant's affidavit showed that deceased lived in Storey County and had many friends who are now zealous to convict defendant. Some of them have stated defendant should die; that they would hang him if he was not convicted. They have been active in procuring evidence and prejudicing the public mind by spreading false reports as to defendant's admissions and as to other crimes alleged to have been committed by him; that the daily press has prejudiced the public mind by false reports of confessions and slanderous charges of complicity on the part of this defendant in other crimes. These things have, as deponent is informed, produced a feeling of hatred, ill will and vengeance against the defendant, rendering it impossible for him to obtain a fair trial in Storey County.

C. E. DeLong shows that the circumstances of the offense, its enormity, etc., have created great excitement. That he has had good opportunity to observe the public feeling, and he thinks, from the false reports of the newspapers as to the confessions made by defendant, and from the excitement produced by the enormity of the offense, the public have generally settled down into a conviction of defendant's guilt, not only of this, but of other heinous crimes, and thinks he could not have a fair trial in Storey County.

A. Genesy, after showing his means of knowledge, which are considerable, states that he has heard an almost universal expression of opinion in the community of Storey County that defendant was guilty, and thinks he cannot have a fair trial in that county.

Besides these affidavits, the District Attorney admitted the following facts, to be acted upon by the Court as if proved by proper affidavit: "That the Gold Hill ' News,' the Virginia ' Daily Trespass,' and the ' Daily Territorial Enterprise,' were three newspapers, printed and published daily in Storey County, Nevada, and of general and universal circulation in said county; that in each of said papers had been heretofore printed and published full and particular details of the murder of Julia Bulette; also of the arrest of defendant, charged with the commission of said murder; also

full reports of the finding of the goods of deceased in the possession of this defendant, and the recognition of defendant, when in custody, by several citizens, as being the person who had at various times offered to sell to said persons articles of clothing and jewelry recognized as being property of deceased. Also, in said papers, the statements had been printed and published that the defendant, after his arrest, and when confronted with the goods of deceased, had voluntarily admitted to one Edwards, Chief of Police, that he was guilty of said crime of murder. Also a statement of the evidence adduced on the examination of defendant had been by said papers published and circulated generally throughout the county of Storey, and read by the citizens thereof."

The Court, on this showing, overruled the motion of defendant, for the time being, but made the following remarks:

" When overruling said motion the Court informed counsel, that having a large number of jurors in attendance, he would first attempt to empannel a jury ; and if from examination of jurors he found that such a bias existed against defendant as to render it quite difficult to obtain a jury, that he would then allow counsel to renew his motion and then would grant it."

The Court finally proceeded to trial without a change of venue, and we are to presume that it was' satisfied, from an examination of the jurors in attendance, that a fair and impartial trial could be had in Storey County.

There are few cases that present themselves to Appellate Courts where it is more difficult to determine upon any settled principles or rule of action, than in these cases relating to a change of venue. By all it is admitted that there is a broad discretionary power allowed the Court of original jurisdiction. But whilst that Court has such discretion, it is still a judicial and not an arbitrary discretion. If that discretion is used in an arbitrary and oppressive manner, an Appellate Court is bound to correct the error. But to distinguish between what is and what is not an abuse of that discretion, is often a very nice and difficult question. There are two circumstances, the existence of either of which should entitle the defendant to a change of venue.

The one is the impossibility of obtaining an impartial jury.    The other is such a state of public excitement against the defendant, that even an impartial jury would be likely to be intimidated and over-awed by public demonstrations against the accused.    There is little in affidavits, or admissions of District Attorney, tending to show such a state of feeling in the public mind as was calculated to intimidate the jury.    It is true, some friends of the deceased had made threats of violence against the prisoner, but there is nothing to show such friends were either sufficient in number or influence to seriously affect the great body of the people.    Indeed, if we can allow that the Judge below was acquainted with the fact, and authorized to act on the knowledge of a fact made sufficiently apparent by the record, that the murdered woman was a cyprian, it should justly have tended greatly to convince him that her friends were not of a class to exercise any great power in forming public sentiment.    If there was any great excitement, it must have arisen from the atrocity of the crime rather than any influence exercised by friends of the deceased.

The showing of the defendant established satisfactorily that the circumstances of the murder were widely discussed ; that a great deal of testimony and many reports about other supposed circum-stances, tending to criminate defendant, were printed, published, and generally read throughout Storey County.    This tended to show that it might be difficult to obtain a fair and impartial jury in that county.    But it did not show conclusively that it would be so. We think the Court below took the prudent plan of ascertaining that fact.    That is, by examining the jurors who were in attend-ance on the Court.    The Court seems to have hesitated, on the production of the affidavits, etc., and to have acted prudently and with due regard to defendant's rights.    The motion for change of venue was only finally refused after the Judge had satisfied himself by examination that an impartial jury could be obtained.    We can-not say that he abused his discretion or acted unwisely in coming to this conclusion.    If we examine the authorities on this subject, we find little that is satisfactory or conclusive.    So far as we have examined them, some cases seem to sustain the views above expressed, and none of them are clearly in opposition thereto.    In

the case of the *State of California* v. *W. B. Lee*, 5 Cal. 353, the Court reversed a judgment against the defendant because the Court below had refused him a change of venue upon a motion sustained only by his own affidavit, expressing the defendant's opinion that he could not have a fair and impartial trial, and showing that over one hundred citizens of the county had united in employing counsel to prosecute.

On the other hand, in the case of the *People of the State of California* v. *John Mahoney*, 18 Cal. 180, the prisoner showed by his affidavit (uncontradicted) that a few years before that time he had been arrested by an armed body of citizens unlawfully organized into what was called a Vigilance Committee, and placed on board a vessel to be transported beyond the State of California; that on making his escape and returning to San Francisco he was again arrested, and after being kept in confinement for some time, he had a sentence read to him by one of the members of that committee (in effect) of perpetual banishment from the State of California, and threatening him with death if he ever returned. Under this sentence he was sent on board of a vessel in irons and thus transported beyond the limits of the United States. He showed this organization, thus dealing out punishment in violation of law, consisted of about six thousand citizens of San Francisco county; that among the number of that organization was the Judge then presiding in the Court where he was tried. He showed that besides these six thousand enrolled Vigilance Committee men (most of whom were qualified to act as jurors) many other persons sympathized with and encouraged the organization. He pointed out the great prejudice which was excited against himself because of this proceeding against him by the Vigilance Committee. Yet the Court below refused him a change of venue, and the Appellate Court refused to interfere with the judgment, holding in effect that they saw no abuse of discretion in the Court below.

In the case of *The People* v. *Webb*, 1 Hill, New York, the Court before which the trial was pending in an indictment for libel, changed the venue upon a showing that the defendant had taken great pains to prejudice the mind of the public against the prosecutor; that inflammatory articles had been sent by defendant,

or through his influence or procurement, not only to others but to three-fourths of the jurors actually summoned to the term of the Court at which the case was expected to be tried.   The Court here seemed to have been influenced by the feeling that defendant's conduct in thus attempting to tamper with the prejudices and feelings of jurors was wholly unjustifiable, and therefore yielded the more readily to the solicitations of the prosecutor for a change of venue. Perhaps, had these publications been sent to jurors by others not connected with or influenced by defendant, they might not so readily have assented.   Here too the change of venue was granted before trial.   It by no means follows that if it had been refused and the trial had resulted adversely to the party asking for the change, the Court would, on review of such case, have reversed the judgment. We have examined many other cases, but none of them, we believe, are more favorable to the views of appellant than two of those we have noticed, neither of which seems to be at war with the views we have expressed.

The next point made by appellant is, that the Court erred in refusing to sustain the demurrer to the indictment.

The body of the indictment (excluding title of Court, caption, etc.) is in the following form:  "John Millain, above named, is accused by the grand jury of the County of Storey, by this indictment, of the crime of murder, committed as follows, to wit: 'That said John Millain, of Storey County, State of Nevada, on the twentieth day of January, A.D. 1867, or thereabouts, at Virginia City, Storey County, State of Nevada, without authority of law and with malice aforethought, killed Julia Bulette by striking her on the head with a stick of wood, and by choking and strangling the said Julia Bulette with the hands of him, the said John Millain; whereof and by means of the blows, choking and strangling aforesaid, the said Julia Bulette then and there died.'

"All of which is contrary to the form of the statutes in such cases made and provided, and against the peace and dignity of the. State of Nevada."

This, as a common law indictment, is obviously defective in several particulars.   It fails to charge that the alleged killing was felonious.   It fails to charge that the defendant did murder Julia

Bulette.   It fails to charge the felonious, willful, and malicious assault which usually precedes the charge of killing and murdering in a common law indictment.

Indeed its defects as a common law indictment are so numerous, it may be said to contain scarcely anything that a common law indictment should contain.   But there was no attempt to make this a common law indictment.   It was simply an attempt to follow a form prescribed by the statute.   There are, indeed, but two questions for us to consider in connection with this indictment.   First, does it conform substantially to our statutory form; and second, had the Legislature power to dispense with the formality of the common law indictment?   Our Criminal Practice Act, as at present amended, contains the following sections:

" Section 235.  It [meaning indictment] may be substantially in the following form:

" State of Nevada, County of ————.   The State of Nevada, plaintiff, against A B, defendant, [or John Doe, whose real name is unknown, defendant].   A B above named is accused by the grand jury of the County of ———— of a felony, [or if of the crime of murder, etc.] committed as follows:

" The said A B, on the ———— day of ————, A.D. 18—, or thereabouts, without authority of law, and with malice aforethought, killed Richard Roe by shooting him with a pistol (or with a gun or other weapon, according to the facts)."

" Section 236.  The indictment must be direct, and contain as it regards: first, the party charged; second, the offense charged; third, the particular facts of the offense charged—so far as necessary to constitute a complete offense—but the evidence tending to prove the charge need not be stated.   It shall not be necessary to set forth in the indictment the character of the weapon used, nor that any weapon was used in the commission of the offense, unless the using of such weapon is a necessary ingredient in the commission of the offense."

" Section 244.  No indictment shall be deemed insufficient, nor shall the trial, judgment, or other proceeding thereon, be affected by reason of any defect or imperfection in matters of form which shall not tend to the prejudice of the defendant."

This indictment certainly contains all that the statutory form requires, and indeed more than that form requires. The form omits (this was undoubtedly an oversight of the draftsman) to show the place of killing. This indictment contains it. The form ends with describing the means used to produce death. This form charges that death was the result of the use of this means. Then in two respects it is a much better indictment than the statutory form requires. The section following that in which the form is given, requires the indictment to show by positive averment the following things: First, who is the party charged? Here John Millain is the party charged in direct and positive language. Second, the offense with which the party is charged. Here the offense is distinctly charged to be murder. Now as murder is an offense clearly defined in the statute, it cannot be questioned that the offense is clearly charged. The only other requirement of this section is: that " the particular facts of the offense charged, so far as necessary to constitute a complete offense," be contained in the indictment. This latter clause might admit of interpretations widely variant. A stickler for old common law forms might well say: " The particular facts of the offense charged could only be shown by stating them with all the particularity required in a common law indictment." One more imbued with the spirit of modern innovation might well say that an indictment in this form was sufficient to comply with this requirement:

" UNITED STATES OF AMERICA,  }  INDICTMENT.
State of Nevada, County of Storey.  }

*In the District Court of the First Judicial District.*

At a term begun and holden at the Court House in Storey County, on the first Monday of June, in the year of our Lord one thousand eight hundred and sixty-seven, and continuing in session at the time of finding this indictment. Present—Hon. RICHARD RISING, presiding Judge. *The State of Nevada,* Plaintiff, *v. John Millain,* defendant.

" Defendant, John Millain above named, is accused by the grand jury of Storey County of the crime of murder, committed as follows:

" The said John Millain, on the twentieth day of January, 1867,

murdered Julia Bulette of the City of Virginia, in Storey County, in the State of Nevada, by striking her with a stick and choking her with his hands."

If the language above used means anything, it means: first, that John Millain is a reasonable human being, for only such reasonable human beings can commit murder; second, that Julia Bulette was a human being, for human beings only can be murdered under all definitions of that word; third, Millain must (the indictment being true) have killed Bulette—there can be no murder without killing; fourth, the killing must have been unlawful; for lawful killing is not murder; fifth, it must have been felonious, for no killing is murder or manslaughter unless it be done feloniously; sixth, it must have been done with malice aforethought, for this is an ingredient in all murder. The time and place are also stated, and the intruments or means used to produce death.

What other facts need be alleged or proved to show the commission of the offense charged? Now, whilst we would not be considered as sanctioning such a form as we have given above, we have no hesitation in saying that, if the Legislature had prescribed such a form in Section 235, we would have been perfectly justifiable in holding that there was no discrepancy between that and Section 236. The Legislature has prescribed a form, and this indictment has followed that form in all its parts, only making two additions to the prescribed form, both of which tend to make the indictment more perfect. They certainly do not detract anything from its certainty and precision. We think this indictment complies with all the requirements of the statute.

In regard to the power of the Legislature to make such an indictment sufficient, we can see no constitutional objection. The power of State Legislatures to prescribe the method of proceedings in civil and criminal Courts, is universally conceded. The Constitution of the United States, and also of our own State, contains a clause to this effect: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on presentment or indictment of a grand jury." This clause of the Constitution would not prevent the Legislature from authorizing the trial of

criminals upon the mere presentation of a grand jury.  A present-
ment at common law was a mere informal statement of a grand jury
(not prepared by the law officer of the Court) calling attention to
the existence of some violation of law which the jury might think
needed correction.    An indictment is defined to be a " written
accusation of one or more persons, of a crime or misdemeanor, pre-
sented to, and preferred upon oath or affirmation by a grand jury
legally convoked."   Now as the Constitution only requires present-
ment or indictment before trial for a capital offense, it did not intend
thereby to prevent the Legislature from prescribing how the grand
jury should form their indictments, but simply that such a body
should in some form express their approbation of the prosecution,
before a party could be put on his final trial for a capital or other
infamous offense.

The next point, and perhaps the most important one made by appel-
lant, is this : that the Court below should have arrested the judgment,
because the indictment was not an indictment for murder in the first
degree, and therefore did not sustain the verdict of the jury.   This
brings up the question, whether murder in the first degree and mur-
der in the second degree are two distinct offenses, requiring separate
and distinct indictments, or whether they are both but one offense,
requiring a single form of indictment ?   The appellant contends
that they are two separate offenses.   That murder in the first
degree contains certain elements of crime which do not necessarily
enter into the simple crime of murder, and that therefore no man
can be convicted of the crime of murder in the first degree, unless
those special circumstances of atrocity which raise it from the
grade of ordinary murder be specially stated in the indictment.
That murder in the first degree is just as distinct from ordinary
murder as murder is from manslaughter.   In support of this posi-
tion, we are referred to the work of Bishop on Criminal Procedure,
Vol. II, Section 562, et sequitur.   The reason of Mr. Bishop in
favor of the proposition that murder in the first degree and simple
murder (murder in the second degree) as defined in a statute
almost identical with ours, is conclusive and unanswerable.   But
whilst Mr. Bishop has labored with zeal and ingenuity to show the
distinct nature of the two offenses—whilst he has not hesitated to cen-

sure Legislatures for sanctioning the practice of allowing criminals to be convicted of an offense for which they were not technically indicted—whilst he has censured Courts for so construing statutes as to allow such a practice, when the language of the statute might fairly (in his opinion) admit of another and more reasonable construction, he has not hesitated to admit that where the statute of a State provides for but one form of indictment for both grades of murder, the Courts have nothing to do but to act on the law as they find it, unless indeed the Constitution of the State shall be opposed to the law.   He seems further, rather reluctantly, to admit that under statutes in the, same form substantially as ours, the various State Courts where such a statute exist have almost uniformly held that the ordinary form of indictment for simple murder was sufficient to support a conviction for murder in the first degree.   We copy from Mr. Bishop's work three sections, which clearly show his views as to what has been held under a statute like ours.   In a note to Section 565, he refers to numerous decisions sustaining the sufficiency of the ordinary form of indictment for murder to sustain a verdict for murder in the first degree :

" Sec. 562. In the work on criminal law, the statutes relating to this subject, with their interpretations, will, as far as their presentation is necessary, appear—except as to the provisions which concern the procedure.   Let us here, however, repeat the parent statute, being the Pennsylvania one of 1791.   It is, with the exception of the part which relates to the procedure, as follows : ' Whereas, the several offenses which are included under the general denomination of murder differ so greatly from each other in the degree of their atrociousness that it is unjust to involve them in the same punishment, etc. ; all murders which shall be perpetrated by means of poison, or lying in wait, or by any other kind of willful, deliberate or premeditated killing ; or which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, or burglary, shall be deemed murder of the first degree ; and all other kinds of murder shall be deemed murder in the second degree."

" Sec. 563. Here is a statute dividing murder into two degrees, precisely as felonious homicide was by Stat. 23, Hen. VIII, Chap.

1, Sec. 3, divided into the two degrees which were afterward termed murder and manslaughter. And if any one wishes to see how the procedure should be, particularly as concerns the form of the indictment, if the statute ended here, he has only to reperuse the discussions under our last sub-title for a complete judicial exposition of the matter. But the statute did not so end. It continued, in the same section, to provide as follows : ' And the jury before whom any person indicted for murder shall be tried shall, if they find such person guilty thereof, ascertain in their verdict whether it be murder of the first or second degree ; but if such person shall be convicted by confession, the Court shall proceed, by examination of witnesses, to determine the degree of the crime, and to give sentence accordingly.'

SEC. 565. "It is never well for legislation to make exceptional provisions respecting the procedure in particular cases. Still, as legislators will sometimes do such things, the Courts must deal with them as best they can. And the course of decision in our tribunals has been that, if the indictment is drawn after any form which would be good at the common law as an indictment for a common law murder, the jury may, by force of the above statutory provisions regulating the procedure, take into their consideration evidence of those facts not alleged, which, added to the facts alleged, constitute murder in the first degree, as distinguished from murder in the second degree. In other words, the indictment need not set out the aggravating circumstances which swell the crime to murder in the first degree, as the indictment for the first degree of felonious homicide called murder is required to do with respect to those which thus swell the offense from the second degree, called manslaughter, to murder. This comes, as just said, from those statutory provisions which regulate the procedure."

Whilst our statute distinguishing between murder of the first and second degree does not contain the preamble as quoted by Mr. Bishop from the Pennsylvania statute, in other respects it is almost an exact copy from the Pennsylvania Act. There are one or two slight verbal discrepancies, but there is nothing which would call for a different rule of action in regard to indictments under the two Acts.

29

We are satisfied from the language of the statute that it was not the intention of the Legislature, in making the distinction in the two classes of murder, to require a distinct indictment for each; and as it had been almost the uniform practice under similar Acts in other States to hold that an ordinary indictment for murder was sufficient to sustain an indictment for the higher crime of murder in the first degree, we must hold that the Legislature, in adopting the statute, also adopted the interpretation heretofore put on it.

Holding, then, that the indictment in this case is a good indictment for murder under the form prescribed by the Legislature, and that any indictment which is sufficient as a simple indictment for murder is sufficient to sustain a verdict for the higher crime of murder in the first degree, the only remaining inquiry to be made is: has the Legislature the power to require a jury, under an indictment for murder, to determine whether the prisoner has been guilty of murder only, or of the higher crime of murder in the first degree.

If we were called upon to determine whether it would be proper for the Legislature to exercise such a power, probably, as lawyers accustomed to all the formalities of the common law, we might answer in the negative. But propriety is one thing—power is another. The Legislature has absolute power over the subject of criminal practice, in most respects. It cannot deprive a party of the right to trial by jury, of the right of appeal, the right to be defended by counsel, the right of compulsory process for his witnesses, and perhaps some other rights which are especially provided for either in the State or United States Constitution. He cannot even be put on trial for an offense punishable with death, or for other infamous crime, without an indictment or presentment by a grand jury. But the form of that indictment or presentment, according to our views, is entirely within the control of the legislative department. Our Statute (Sec. 412 of the Criminal Practice Act) declares: " In all cases the defendant may be found guilty of any offense, the commission of which is necessarily included in that with which he is charged in the indictment, or may be found guilty of an attempt to commit the offense charged."

So the Legislature might, in our opinion, declare that when a

The State of Nevada *v.* Millain.

person is indicted for manslaughter only, he may be found guilty by the jury of either manslaughter, murder in the second degree, murder in the first degree, or be acquitted, as all the facts proved, taken in connection with the law of the land, shall appear just and proper.    Indeed, if no distinction is to be made between murder in the first degree, which is punishable with death, and murder in the second degree, which is only punishable with imprisonment, it would seem but reasonable that all distinction as to the form of indictment between simple murder and manslaughter should be abolished, for each of these crimes is punishable by imprisonment only, and they both may be for the same term, to wit: ten years—the only difference being that ten years is the shortest period in murder and the longest in manslaughter.    If indictments in these cases are to be governed by any philosophical rule, they should clearly designate the grade of the offense with which the prisoner is charged, clearly distinguishing the offense charged from the next lower grade; or else there should be but one form of indictment for all unlawful homicide, leaving the jury to determine, from facts proved on trial, the grade of the offense.    It is, however, our business to administer the law as we find it, and not make law.

The argument of Mr. Bishop against the power of the Legislature to dispense with the finding of an indictment for murder in the first degree, specifically pointing out those circumstances of deliberation or atrocity which raise it from the degree of simple murder to the higher crime, are principally based upon the following clause of the Constitution of Massachusetts: " No person shall be held to answer for any crime or offense until the same is fully and plainly, substantially and formally described to him."

It is sufficient to say, in answer to his arguments, so far as they are sought by appellant to be applied to this case, that we have nothing in our Constitution at all similar to this.

Appellant contends that there is not sufficient evidence to sustain the verdict; that the whole amount of proof is that defendant was found in possession of some of the property of deceased.    We view the proof in a different light.    He was found in the possession of a large amount of the property of the deceased, and of that property which she had only a few hours before her death; not only in pos-

session of an amount of her property, which he could not well have obtained honestly, but he is shown to have made false statements in regard to it.

At least, if the statements were true, he could easily have proved some of them to be so, which he neither did, nor attempted to do. He made statements in regard to the dresses and jewelry having belonged to his wife, who he said was dead. Yet on the trial he made no attempt to show he ever had a wife, nor any attempt to find the woman who had (according to his story) sent a dress pattern by him for sale. When he sold the diamonds, instead of selling them in their settings, he took them out of the gold setting and sold them separately. This was not the conduct of an innocent man.

The possession of property recently stolen, or taken from the owner by the perpetration of other felony, such as burglary or robbery, etc., is at least some evidence against the person having possession of the same that he is the felon. If the property is such in character or quantity as would not be likely to come honestly into the hands of the person with whom it may be found, as ladies' dresses, jewelry, etc., in the hands of a single man not engaged in trade or pawnbrokerage business, this would greatly strengthen the evidence. If such articles were found in large quantity, beyond the apparent means of the party to acquire honestly, this would still further increase the strength of the evidence. If the party should, in addition to all these things, tell lies about the property, and attempt to dispose of it under false pretenses and representations, the evidence would become conclusive beyond all reasonable doubt. In this case the evidence seems satisfactory that the defendant was guilty of the offense charged.

The only remaining question to be discussed is, did the Court err either in giving its instructions or in withholding those asked by the defendant. The first portion of the charge to which exception is taken is, that the Court charges the jury that they must find the prisoner guilty of murder in the first degree, murder in the second degree, or not guilty ; thus taking from them the right to find the prisoner guilty of manslaughter.

The evidence here shows, if it shows anything, that deceased was killed at a late hour of the night or in the morning in her bed, and

that after the killing, the house was robbed.   There is no testimony attempted to be introduced by defendant showing or attempting to show the killing might have been done in a quarrel or fight.   The law presumes that every unlawful voluntary killing is murder.

In the absence then of any explanatory evidence, the defendant was guilty in the eye of the law of murder, or nothing.   It was therefore proper to give the charge as above stated.   If it was proper under such a state of facts to charge the jury they might in their discretion find the prisoner guilty of manslaughter, it was equally proper to charge they might find him guilty of an assault to commit murder, or even guilty of a simple assault, for both of these are crimes of which a party under our statute may be convicted upon an indictment for murder.   Yet in a case where a party was beyond all question slain and another party indicted for the murder, it would seem ridiculous to charge the jury that they might find the defendant guilty of a simple assault.

Appellant quotes the following language from the Judge's charge, and complains that it is erroneous:

"If you believe from the evidence that about the nineteenth day of January last, at Virginia, Storey County, the defendant, with malice aforethought, either expressed or implied, and with deliberation and premeditation, did unlawfully kill Julia Bulette, with intent to take her life, it will constitute murder of the first degree; and you should so find; otherwise you will acquit."

The objection to this is, that in effect the Jury are instructed what it takes to make murder in the first degree; and after being so instructed, they are told that if they cannot find these circumstances to have attended this killing, they must acquit the defendant. If there is any objection to this instruction, it is too favorable to defendant.   The jury are instructed in effect, if you fail to find that the killing of this woman was attended with a deliberate and premeditated intent to kill (circumstances which raise the offense of simple murder to murder in the first degree) you will acquit the defendant although you may believe he was guilty of the crime of murder; that is, of killing the deceased with malice aforethought, but without a deliberate or premeditated intent to kill.   If then, this instruction was erroneous,

a point we will not now discuss, it was an error in favor of, not to the prejudice of the prisoner.

The next language complained of is this: "If you believe the defendant guilty of an offense, and doubt as to the degree, you can only convict of the lowest degree of crime within the grade of the one charged—murder in the first or second degree."

This language is not technically correct, but could not operate to the prejudice of defendant if we are right in the first views expressed about the Judge's charge. That is, that there was no testimony before the jury authorizing them to consider the guilt or innocence of the prisoner in regard to any crime less than murder.

In another portion of the charge the Judge, after speaking of the unsatisfactory character of conclusions drawn from the mere fact of the prisoner being found in possession of stolen property, adds : " It will be necessary for the prosecutor to add the proof of other circumstances indicative of guilt in order to render the naked pos-session of a thing available to a conviction, such as the previous denial of the possession by the party charged, or his refusal to give any explanation of the fact, etc."

This language is complained of because, says counsel for appellant: " This language unexplained led the jury to conclude that the defendant's failure to testify and explain these things when the law held out to him an opportunity to do so, accompanied by proof of the possession, would warrant them in finding a verdict of guilty."

At common law the failure of the prisoner to account for the possession of stolen goods was held a strong circumstance against him, although from the rules of evidence under that system it was frequently difficult if not impossible to do so. At least it might be impossible even for an innocent man to account for his possession under the rule of evidence as established at common law.

This instruction would formerly have been correct. Surely it cannot be incorrect now, because the prisoner has one means of accounting for stolen goods in his possession, which he did not have at common law.

In another portion of the instruction the jury were properly cautioned against giving any effect or weight to the silence of the prisoner. The same observations we have made in regard to this

latter point will apply to some other matters contained in the charge.

That portion of the charge which at first blush seemed to the writer of this opinion most questionable, is contained in the following language :

" The distinction between murder of the first or second degree is quite nice. I will briefly state such distinction, although from the testimony I apprehend that you may conclude that the defendant was either guilty of murder of the first degree, or innocent."

Our Constitution provides that ".Judges shall not charge juries in respect to matters of fact, but may state the testimony and declare the law."

This language is contained in many of the newly adopted State Constitutions. When it was first introduced, or where these peculiar expressions originated, we have been unable to find in the limited period we have devoted to the subject.

Nor have we found much adjudicated as to the force of these expressions, or the construction to be put upon them.

The California Constitution contains the same language, and the Supreme Court of that State, in the case of the *People* v. *Ybarra,* 17 Cal. 170–1, use this language : " The jury," says Chitty, " are as much judges of the fact as the Courts are of the law, and have an absolute power to acquit or convict; and it would be a great responsibility for the mind of a Judge if he were to decide on the guilt or innocence of the prisoner. (1 Chit. Crim. Law, 528.) The rule at common law appears to be that a Judge may express to the jury his opinion in regard to the·weight of evidence. ( *Commonwealth* v. *Childs,* 10 Pick. 252.) But it has been held in Alabama that a Court should not charge as to facts, even in a civil case. ( *Tubbs* v. *Madding,* 1 Minor, 129.) It is unnecessary to inquire whether the instruction in this case was in violation of the principles of common law; it was clearly within the prohibition of the Constitution, and cannot be maintained without disregarding the express provisions of that instrument. The language of the Constitution is : that ' Judges shall not charge juries with respect to matters of fact, but may state the testimony and declare the law.' (Const. Art. VI, Sec. 17.) This provision is violated whenever

a Judge so instructs as to force the jury to a particular construction upon the whole or any part of the case, or to take away their exclusive right to weigh the evidence and determine the facts. The meaning of the provision is, that the Judge shall decide upon the law and the jury upon the facts, and that the former shall not invade the province nor usurp the powers of the latter. The Judge has no more right to control the opinion of the jury upon a matter of fact than the jury have to disregard the directions of the Judge upon a matter of law."

From the views here expressed, we should say that the Court in effect held that this clause in the Constitution is but an affirmance of the common law principle, that the Court is to be the judge of all questions of law and the jury of all questions of fact. So far as the testimony is concerned, the Court is usually the exclusive judge as to its admissibility; the jury must determine as to its weight, after admitted. But whilst the jury can determine as to the weight and credibility of testimony, the Court may certainly at common law determine whether there is, or not, any testimony tending to prove a certain fact or facts which are essential to sustain an action or support a prosecution. It is on this principle that Courts daily grant nonsuits in civil cases, and in criminal cases direct or advise juries to acquit.

If a prisoner is under indictment for murder, and the prosecution fails to establish the fact by at last reasonably conclusive testimony that the person charged to have been killed is really dead, the Court would not hesitate to direct or advise the jury to acquit. So too when a party is charged to have committed murder by poisoning, and all the proof is directed to such a charge, and the deceased is shown to have died by poison and not by any other kind of violence, surely it would not be improper in the Judge to say that all felonious and willful poisoning which proves fatal is murder in the first degree; and as there is no charge or proof against defendant that he caused the death of the party he is accused of murdering in any other way than by poisoning, therefore I advise you there is no proof to justify a conviction of murder in the second degree or manslaughter. Therefore, if you are fully satisfied that the prisoner caused the death of deceased by poisoning, you will convict of

murder in the first degree.   But if you have any reasonable doubt on this subject you will acquit.   Such an instruction seems to us in such a case not only proper, but where the testimony is doubtful, necessary for the protection of the prisoner.   Otherwise the jury, when they are not fully satisfied of the guilt of the prisoner, might compromise with their consciences by finding him guilty of an offense which would not deprive him of life.

In the case of the *State* v. *Phillips*, 24 Mo. 475, referred to by Bishop in a note to section five hundred and sixty-five of his valuable work on Criminal Procedure, the Appellate Court seems to have granted a new trial because the Court below gave instructions in regard to murder in the second degree, under which instructions defendant was found guilty of that offense, where the indictment was for murder in the first degree, and we infer [for we have not the twenty-fourth Missouri Reports to examine] the testimony was such that he must have been guilty as charged, or not guilty at all. So far as we can understand the case, it sustains the views we have here expressed, and even goes further than perhaps we would be willing to go.   With our present impressions we should certainly hesitate to grant a new trial merely because the jury had found him guilty of a less offense than the one really committed, unless indeed he himself had distinctly asked the jury to be instructed that they must find him guilty of the higher offense or none.   Then, if there was no pretense of there being any evidence to justify the lower degree of crime, it would become a serious doubt if the prisoner would not be entitled to a new trial or a discharge.   But it will perhaps be time enough to meet this question when it arises.   For this case it is sufficient to say, it is in our opinion no violation of the constitutional provision referred to for the Court, in a clear case, to instruct the jury that there is, in the opinion of the Court, no evidence tending to convict a prisoner of any lower grade of offense than the one charged.   If however there is any evidence at all, however slight, on any reasonable theory of the case consistent with the evidence given, under which the defendant might be convicted of a lower grade of offense than the one charged, then the Court should instruct as to the nature of both, or of any offense of a lower grade of which the prisoner might by possibility be found guilty,

leaving the jury to determine all questions of fact about which there might be any controversy among reasonable men.

Taking the testimony and the legal presumptions arising therefrom in this case, and there could be no question but that the offense was of a higher grade than manslaughter. Whether it could have been held to be of a lower grade than murder in the first degree by a reasonable being, may be somewhat doubtful. Whether it could or not, the mere expression of the Judge that he thought the jury, under the evidence given, might conclude either that the prisoner was guilty of murder in the first degree or else not guilty, when accompanied with a clear and explicit instruction as in this case, that the jury might find him guilty of murder in the first or second degree, is not error injurious to the prisoner.

There is nothing wrong in the definition of murder in the first degree, as given by the Court to the jury—at least nothing to mislead the jury. There is no real distinction in the meaning between the word "inferred," as used by the Court, and "implied," as used in the statute. Nor was it necessary for the Court to tell the jury that murder by lying in wait, poison, etc., was murder in the first degree. There was no evidence or charge of such killing in this case. It was sufficient to show that where the killing was willful, premeditated, unlawful killing, it amounted to murder in the first degree.

The next complaint of appellant is that the Court instructed the jury that the intent to kill " need not have existed for any given length of time before the killing." In other words that willful, deliberate and premeditated killing might take place in cases where the design to kill was formed at the very moment of striking the fatal blow. This we think the settled law. (See the case of *The People* v. *Clark*, seventh New York, 3 Selden, Court of Appeals, pp. 385 to 395; see also, Wharton's Criminal Law, Sec. 1,113.) The case of *Sullivan* v. *People*, 1 Park, Criminal Report, was overruled in the case cited from seventh New York, and the Iowa case alone stands to support appellant's views, against numerous authorities on the other side.

We apprehend the true difference between simple · murder (or murder in the second degree) and murder in the first degree,

under our statute, does not consist in the length of time the mur-
derer must have deliberated, but whether he had, at or before strik-
ing the fatal blow, formed the design to slay his victim.    If such
design was formed, however recently, it will be murder in the first
degree.

If it be asked, what is the distinction between willful, deliberate,
premeditated killing, under our statute, and killing with malice
aforethought; the answer is that malice aforethought, as used in the
old common law indictments, did not necessarily imply that there
was any preconceived intent to take life.    The malice aforethought
may have been only a preconceived intent to commit some other
felony.    If, for instance, in our State, a party were to attempt,
upon a preconceived design, to commit mayhem, and the blow given
in the attempt should prove more serious than was intended, and
produce a fatal result ; this would be murder.    The preconceived
intent to commit a felony would furnish the ingredient of malice
aforethought.    But in such supposed case, there is no willful, delib-
erate or premeditated intent to kill ; consequently the crime would
be but murder in the second degree.

Appellant objects to the following language used in the Judge's
charge :    " By reasonable doubt is ordinarily meant such a one as
would govern or control you in your business transactions or the usual
pursuits of life."    This is objected to on the authority of *Jane* v.
*The Commonwealth*, 2 Metcalf, Kentucky Reports, p. 30, referred
to also in the twentieth U. S. Digest, p. 482, Sec. 142.

An examination of the case in second Metcalf does not, in our
opinion, support the views of appellant.    We do not deem it neces-
sary to go into an analyzation of the Kentucky case to show the
distinction between that and this.    Suffice it to say that the pecu-
liar phraseology of the instruction in that case was such as in the
opinion of the Appellate Court might perhaps have induced the
jury to believe they were to weigh the testimony and decide the
case on the weight of testimony.    Here there is no such complaint.
The jury were plainly told that if they had any reasonable doubt
as to defendant's guilt they must acquit.

There does not appear to be any serious objection to the instruc-
tions given, other than that they are too long and contain many

things which were unnecessary and rather calculated to confuse than enlighten the jury.

Among other instructions asked by the prisoner were the following : " The jury is instructed that the fact that the clothing or other property of the deceased was found in the possession of the defendant after her decease is not sufficient of itself to warrant the jury in finding the defendant guilty under the indictment against him." " You are instructed, even if you find the goods belonging to deceased in her life were in possession of defendant, that this is a fact by no means conclusive, but one ' whose persuasive power is very slight.' "

Both these were refused by the Court, and the prisoner's counsel excepted.

We are of opinion the Court did perfectly right in refusing these instructions. It is true, the mere fact of finding property that had belonged to deceased in the possession of defendant, might not be sufficient to warrant his conviction, or even to raise a reasonable suspicion against him. For instance, had the defendant been a pawnbroker, and had there been a single article, or only two or three articles of property which had belonged to deceased found exposed in his shop window, this would hardly have been a suspicious circumstance. On the other hand, the number and value of the articles found, the place where they had been concealed or deposited before found, and other circumstances which we can imagine connected with the finding, might clearly indicate the defendant's guilt.

To give them such instructions as these is simply calculated to mystify and confuse the jury. The Court did perfectly right in refusing to give them without the necessary and proper qualifications.

The Court did, in fact, give these instructions in the charge to the jury with the proper qualifications and explanations, as the following extracts from the main charge will show :

" The testimony in the case tends to show the property of the deceased, or some portion of the same, in the possession of the defendant, at a time subsequent to the alleged murder, and at quite a recent date. The degree of weight to which this character of

testimony is entitled in law is laid down by Greenleaf in his work
on Evidence, and I have extracted from and incorporate as a part
of my instructions to you, a portion of section thirty-one of the
third volume:  ' The caution necessary to be observed on this
point applies with more or less force in all criminal trials, but from
the nature of the case is more frequently and urgently demanded
in prosecutions for homicide and larceny.   We have heretofore
adverted to the possession of the instruments or the fruits of a
crime as affording ground to presume the guilt of the possessor;
but on this subject no certain rule can be laid down of universal
application; the presumption being not conclusive but disputable,
and therefore to be dealt with by the jury alone as a mere infer-
ence of fact.   Its force and value will depend on several consider-
ations.   In the first place, if the fact of possession stands alone,
wholly unconnected with any other circumstances, its value or per-
suasive power is very slight, for the real criminal may have artfully
placed the article in the possession or upon the premises of an inno-
cent person, the better to conceal his own guilt.   *    *    *    *

" ' It will be necessary for the prosecution to add the proof of
other circumstances, indicative of guilt, in order to render the
naked possession of the thing available towards a conviction, such
as the previous denial of the possession by the party charged, or his
refusal to give any explanation of the fact, or giving false and
incredible accounts of the manner of the acquisition; or that he has
attempted to dispose of it, or to destroy its marks, or that he has
fled or absconded, etc., or other circumstances naturally calculated
to awaken suspicion against him, and to corroborate the inference
of guilty possession.'

" If you should be satisfied from the evidence that the articles of
jewelry, clothing and watches exhibited, or any of them, were in
the possession of Julia Bulette at the time of her death, and were
taken and carried away at said time, by the person who caused her
death, and that the articles so taken were afterwards found in the
possession of John Millain, defendant, it devolved upon him to
explain and account for such possession by him, and unless he has
explained his possession to have been by means not connected with
the death of deceased, or upon any reasonable hypothesis of his

innocence, and this fact being supported by other circumstances indicative of guilt, you will be warranted in giving such facts such weight as you may deem proper tending to establish guilt."

The record shows that the jury did not see the instructions refused, or hear them read; so there was no harm done to the defendant by the Court refusing to give these instructions without explanation.

Mere abstract principles of law not applicable to the state of facts found in the case, should not be given by way of instruction to a jury.

I am of the opinion that the judgment should be affirmed, and the Court below directed to fix a day for carrying its sentence into execution.

Opinion by JOHNSON, J.

There are numerous questions presented by this appeal, all of which have been very thoroughly considered in the foregoing opinion of the Chief Justice; and as I agree with him in the conclusion attained therein, I consider it unnecessary to review all the points made on defendant's behalf, and shall therefore restrict my inquiries to the more material questions wherein I do not fully coincide with our brother Beatty in the reasoning he advances in support of such conclusions, together with some additional authorities bearing upon these questions, arising on the case.

In their consecutive order, the first error assigned is the refusal of the Court below to exclude D. Black from the panel of grand jurors. Upon being interrogated under oath touching his competency as a grand juror in this case, he stated that " he had heard of the charges against defendant, and had an opinion touching the guilt or innocence of defendant." " That he might be required as a witness for the purpose of identifying a piece of the property recovered as belonging to deceased." " That he did not know whether he would be called upon as such witness." " That he was not a prosecutor of defendant, and was taking no interest in his prosecution for the offense." Counsel for the defense thereupon challenged said Black for one of such jury, for this : " first, that he was a witness for the prosecution in reference to the charge against

defendant; second, that he had formed and expressed a decided opinion that the defendant was guilty of the said offense for which he had been held to answer." This assignment of error might properly be disposed of here without further inquiry.

The grounds stated by defendant's counsel on this point are not sustained by the record. Black says nothing about a decided opinion, a qualifying word peculiar to this portion of the criminal code, and evidently used in this connection so as to admit of persons on the grand jury who would be excluded under the more rigorous rule applied to trial jurors, whose opinions, formed or expressed, were "unqualified," as prescribed by the statute. The juror merely says that he "had an opinion touching the guilt or innocence of the accused." This alone was no sufficient ground for excluding him from the panel.

Furthermore, I cannot perceive wherein the presence of this juror at the grand inquest could, under any rule, statutory or otherwise, have prejudiced the rights or interests of the accused, as the record before us does not show that he was either a witness before the grand jury or upon the trial at which the conviction was had. And the record is so fully presented to us as to authorize us in believing that he was not a witness before either of the juries. As I have stated, in my judgment this point need not necessarily be pursued farther, but the earnestness and zeal with which counsel has pressed this question upon our attention (and the same remark in phrase yet more complimentary is justly due to that distinguished counsellor in respect to his conduct of the entire case) seem to call for a more extended examination of the questions involved in this point.

The insufficiency of these challenges must be tested by the statute law of the State, irrespective of the rule at common law or by the statutory regulations prevailing elsewhere. Sec. 180 of the Criminal Practice Act as originally adopted in 1861, specified as the only grounds of challenge to an individual grand juror: "first, that he is a minor; second, that he is an alien; third, that he is insane; fourth, that he is a prosecutor upon a charge against the defendant; fifth, that he is a witness on the part of the prosecution and has been served with process—or bound by an undertaking as

such; sixth, that he has formed or expressed a decided opinion that the defendant is guilty of the offense for which he is held to answer." This section was amended by Act of the twenty-second of January, 1866, p. 49, (in force at the time this grand jury was empanneled) so as to read as follows: " A challenge to an individual grand juror may be interposed for one or more of the following causes, and for no other: first, that he is a minor; second, that he is an alien; third, that he is insane; fourth, that he is the prosecutor upon a charge or charges against defendant." Thus it will be seen, that the fifth and sixth subdivisions of the section were no longer in force—a fact which counsel for defendant had doubtless overlooked when he framed the objections to the juror Black.

This is inferred from the fact that the objections are stated in verbiage almost verbatim with that contained in the repealed parts of the section. The objection would not have been tenable under the former statute, much less under the Act as amended. The statement was simply that " he had an opinion as to the guilt or innocence of the accused," not that he formed or expressed any decided opinion. Nor did his statement show in the language or meaning of the former Act that he was " a witness on the part of the prosecution who had been served with process or bound by an undertaking as such."

But counsel furthermore insists that " even if a person expects to be a witness for the State," a challenge will lie under the fourth clause of the section, to wit: " the prosecutor upon a charge against the defendant." The form in which Section 180 stood in the original Act shows that a distinction was taken between " the prosecutor " and one who was merely a " witness." They are differently classified: one is definitely spoken of as *the* prosecutor —the other indefinitely as *a* witness; and if " prosecutor " was intended to mean " witness," and if no special significance or meaning attached to the word " prosecutor," in the fourth clause of the section, why the need of the fifth clause at all—but more especially why the object of limiting the challenge to such witnesses only " as had been subpœnaed or recognized to appear as such?" Under the section as it originally stood, it would scarcely be contended that a witness could be excluded from the panel on the

ground that he was a witness for the prosecution, unless it also appeared that "he had been subpœnaed or recognized to appear as such;" therefore, whenever this qualified right of challenge has been withdrawn by the amendment it certainly cannot operate, as would be the effect of the rule urged by counsel, to further extend the rights of defendant, so as to include as grounds of challenge such as were not permitted before this amendment. As the law stood, a witness subpœnaed or held to appear as such, on behalf of the State, or one who had formed or expressed a decided opinion as to the guilt or innocence of a person accused of crime, was held to be disqualified as a grand juror in that particular case; but when these inhibitions were removed, the policy of which it is not our province to determine, we must conclude that the change was made for the express purpose of disallowing a challenge for either of these grounds, and thereafter to confine the privilege of challenge to the causes embraced in the other clauses of the section; any other conclusion is unsupported by the light of reason or authority. I conclude that the juror was not disqualified under the law.

Before leaving this branch of the case, I will further remark that, whilst I have no doubt but that the construction herein given to this section is correct, yet I have encountered some difficulty in determining the proper answer to defendant's counsel, as to the legal understanding of the word "prosecutor," as used in this Act. That it was intended in a different sense from the word "witness," I have already attempted to show; and for the purposes of this case, it is unnecessary, perhaps, to pursue the investigation further. From a somewhat extended range of examination which I have bestowed upon the questions arising here, I conclude this : that under our system of criminal practice, the word is used in a limited and greatly restricted sense. This word is adopted from the statutes of another State, where it is essential to the validity of an indictment that the name of the prosecutor shall be indorsed on the indictment. And such is the law in many of the States; but in every instance so far as I am advised, a marked distinction is taken between the one person known as the "prosecutor" and such as are merely witnesses. For illustration: the law in this particular in

Pennsylvania, by the revised Act of 1860, provides that " No person shall be required to answer to any indictment for any offense whatsoever, unless the prosecutor's name, if any there be, is indorsed thereon; and if no person shall avow himself the prosecutor, the Court may hear witnesses, and determine whether there is such a private prosecutor, and if they shall be of opinion that there is such a prosecutor, then direct his name to be indorsed on such indictment." (American Cr. Law, Sec. 480.) In the same State, under an earlier statute, whilst it provided that " No person shall be obliged to answer to any indictment or presentment, unless the prosecutor's name be indorsed thereupon," no provision being made as in the later Act to ascertain who the prosecutor was, it was held " that the Act did not go so far as to require that a prosecutor should be indorsed, in cases where no prosecutor exists." (1 Dallas, 7.) I cite this authority to show that the distinction was constantly preserved between the mere witness and the prosecutor, as we cannot well conceive of an instance of an indictment being found by a grand jury without the presence of witnesses.

Authorities to the same effect as the above are numerous, many of which will be found collated in Vol. 1 Am. Cr. Law, Secs. 496–498. In this State, however, no such requirement obtains; but instead, the indorsement is made by the foreman of the grand jury, and the names of witnesses examined before such a jury are also required to be indorsed on the indictment. Now it may probably occur in many instances in criminal proceedings that in the sense the term is used in our code a witness may also be prosecutor, in which case of course he would be excluded under the fourth subdivision of the section referred to. Also, it may happen that there is a prosecutor who is not a witness, in which case the same rule would apply. It is not my purpose to attempt to show that this word as here used has no peculiar meaning, but the contrary. Inasmuch as this word occurs, I believe, in the one single instance in our Criminal Practice Act, it is quite impossible to lay down a general rule sufficiently comprehensive to cover its full meaning as here used. Probably the views of the Chief Justice on this point are substantially correct.

The second assignment of error is an objection to the trial of

panel jurors. This objection was made orally and in general terms, thus : " In drawing and summoning there had been a material departure from the form prescribed by statute in respect to the drawing of said jury." Our statute, in respect to. the allowance of challenges in such cases, recognizes a marked distinction that must be observed. " A 'challenge to an individual juror may be made orally, whether peremptory or for cause, and when peremptory no reason need be given." (Crim. Pr. Act, Secs. 335, 342.) " If the challenge be made to the panel, it must be in writing, specifying plainly and distinctly the facts constituting the grounds of challenge." (Id. Sec. 324.) Possibly the formal part of the law would be sufficiently complied with if the objections were noted on the minutes or records of the Court, so that they could be preserved in an authentic shape; but it is indispensably necessary that facts, and not mere conclusions from facts, be stated. A general statement of the ground of objection, as is the case here, is not enough. The need of this requirement will be, apparent on inspection of several succeeding sections, in which provision is made for the trial of a controverted issue, whether of fact or law, arising upon matters set out in the challenge. This point is very fully and ably reviewed in reference to a matter bearing some semblance to this— that of a challenge to a trial juror in *Freeman* v. *People*, 4 Denio, 31, per Beardsley, J., and amply supports the conclusions here attained. The challenge was made in the case at bar in general terms. No specific facts were stated upon which an issue of either law or fact could be joined, but simply a general statement, which amounted to nothing more than a legal conclusion. This was clearly insufficient, and the Court very properly overruled the challenge.

Next for our consideration are the exceptions taken to the ruling made in reference to the trial jurors, assigned as the third ground of error, for what is termed in our statute " implied bias," and embraced within the eighth clause of Section 340 of the Criminal Practice Act: " Having formed or expressed an unqualified opinion or belief that the prisoner is guilty or not guilty of the offense charged." The diversity shown by the decided cases on the point under consideration led the late Judge Baldwin to remark that

" upon no one question of civil or criminal practice have the decisions of Courts been more inharmonious than upon questions of qualifications of jurors arising from the formation or expression of opinion of the guilt or innocence of the accused." (*People* v. *Reynolds*, 16 Cal. 132.) The state of the law on this point, from the opposing and contradictory character of the decisions, being so uncertain, induced the Legislature of California at its first session to settle, as was supposed, the rule of law by legislative enactment, and which provision we have introduced into our criminal statutes. As before shown, to disqualify on this ground, the opinion or belief formed or expressed must be an unqualified one. This enactment in California was followed by a decision of the Supreme Court (*People* v. *McCauley*, 1 Cal. 379) in which the statute was fully upheld and enforced. But in course of time the rule under this statute, as afterwards interpreted by the same Court, became much relaxed ; and ultimately not only this decision, but the statute also, was practically nullified, so that when the learned Judge made the statement just quoted, the decisions of that Court on the point in question furnished no exception to other evidences of the undoubted fact. These opposing and contradictory rulings necessarily produced much confusion and embarrassment in the trial of criminal cases, especially those of the highest grade ; until finally the Court resolved on a convenient occasion to review the question, and establish a fixed and definite rule, conforming to the evident meaning of the statute. Fortunately this labor was intrusted to one eminently qualified, the result of which was the very fully considered opinion pronounced in the case we have cited from the Sixteenth California Reports. This has been accepted as a correct exposition of the law, and remains, I believe, to the present time unquestioned in their highest Court. Indeed, the principles then enunciated have been applied in a number of cases since then, particularly in *The People* v. *Mahoney*, 18 Cal. 180. The facts upon which a challenge was denied in that case are not materially different from this. In my judgment the construction given to this part of the criminal code by these later decisions is the correct one. Applying these principles to the case made by the answers of these jurors, I must hold, with the Chief Justice, that the ruling of the Court was correct in disallowing the challenge.

The fourth ground of error is the refusal of the Court below to change the venue. This application is preferred under the provisions of Sections 306 and 308 of the Criminal Practice Act, and is supported by several affidavits. The distinct ground of application is that a fair and impartial trial cannot be had in the county, and which, under the code, " must be granted if the Court be satisfied that the representation of the defendant be true." Counsel lays much stress upon the circumstance that the matters contained in the affidavits, showing why this change should be had, are not refuted by opposing evidence ; and he claims that these statements must be accepted as true. Admit this is so : does it necessarily follow that the representation of the defendant that he cannot secure a fair and impartial trial in the county is also true ? By no means. The Court must determine the question by all the circumstances surrounding it, and be guided in its judgment, stating the proposition in the form in which counsel presents it, by the exercise of a reasonable and legal discretion. Now the particular facts and circumstances detailed in these affidavits, independent of the representation of defendant as to the trial, might be literally true, and yet from so populous a community as inhabit Storey County a fair and impartial jury be secured for the trial of the accused.

This probably was the conclusion of the Judge, and whilst he was unwilling to embarrass the prosecution by granting a change of venue without an effort to secure a jury within the county, he distinctly notified the defendant's counsel that he might renew the motion if it should afterwards appear difficult to procure such jury. Under the circumstances, it seems to me the Court evinced a proper and considerate regard for the rights of both the prosecution and defense, (for certainly the prosecution has rights as well as the defense, although in practice it often is the case that the rights of the one are lost sight of . in the anxious endeavor to screen the guilty from merited punishment) and as it does not appear that the motion was renewed, we may infer that the defense were willing to chance a jury in that county.

A decision in point is contained in *People* v. *Plummer*, 9 Cal. 298, where on appeal, the lower Court was sustained in its ruling on a similar question. Also, in *People* v. *Mahony*, 18 Cal. 180,

an authority cited by defendant's counsel and commented on by the Chief Justice. The last is probably even a stronger case against the defendant, for it will be seen that notwithstanding Mahony made out a very strong case, the Court overruled the motion, with leave to renew it, which he did do on the same day and again the day after, and each time it was refused. This ruling was sustained on appeal.

Appellate Courts are at all times exceedingly loth to disturb a judgment in a criminal case solely on the ground that the *nisi prius* Courts have refused a change of venue, and the instances are of rare occurrence where it has been done. For instance, in California, of a large number of appeals going to the Supreme Court, involving this question, I find but a single one, *People* v. *Lee*, 5 Cal. 353, where the judgment was reversed on this ground, and even that decision is sharply criticised in the later case of *People* v. *Graham*, 21 Cal. 261, and held to be unreliable as authority. I conclude there is no error in the ruling of the Court refusing the change of venue.

The fifth and sixth grounds of error may be considered under one head, as all the exceptions go to the alleged defects in the indictment. The objections taken by counsel on these points may be summed up thus: first, the criminal code requires of an indictment for murder that it shall contain all the essential averments needed at common law; or second, if the code has dispensed with any of the essential averments required at common law, the Act itself is unconstitutional.

Neither of these positions is tenable. The criminal code which in Section 232 has declared " all the forms of pleading in criminal actions, and the rules by which the sufficiency of pleadings are to be determined, shall be those which are prescribed by this Act," conveys no words of idle meaning, but is the mandate of the law which Courts should regard and obey. The very full and complete showing by the Chief Justice of the various sections of the code bearing on this question, shows how zealously the law-making power have endeavored to abolish needless " technicalities and subtleties invented as the means of administering justice, and in their stead substituted a system of pleading founded upon the unerring prin-

The State of Nevada *v.* Millain.

ciples of justice, and having for their end the attainment of right without regard to form." It is true there is some conflict in the decisions growing out of these statutory modifications, but wherein they have not given full expression to the spirit and purpose of the code they are but the occasional exhibitions of a " conservatism," as it has been termed, " of a profession which would impede but cannot arrest the progress of a more enlightened understanding of the true principles upon which the science of the law is founded ; that would cling with a blind subservience to rules originating in a day of comparative darkness, rather than be guided by the simpler precepts which a reformatory and progressive spirit has inaugurated." These questions must be tested by the statute law, so far as it has pointed out the mode of procedure ; and authorities which in effect ignore the distinct and emphatic rules that it has prescribed can serve no purpose in determining our action. " The object of pleading, whether in civil or criminal actions, is to inform the parties of the facts alleged by each against the other with such clearness and distinctness as to enable them to prepare for the trial of disputed facts, or for the application of the law to those which are admitted. Refine as we may upon the mode of effecting this object, the most devoted worshipper of the ancient forms will not deny that this is the only legitimate object of pleading. And in its application to criminal cases, in which no special pleading is required on the part of the defendant by the code (except where a former conviction is pleaded, which must be in a brief, prescribed form) the elements of pleading may be still further condensed into this definition : that it is a statement of a crime imputed to the prisoner, with such a particularity of circumstances only as will enable him to understand the charge and prepare for his defense, and as will authorize the Court, applying the law to the facts charged, to give the appropriate judgment upon conviction." (Report of Code Commission, New York, 1849, p. 141.)

Our criminal code originated with the Code Commissioners of New York. When originally adopted in 1861, it was confessedly a copy of the California Act of May 1, 1851, but this in turn was conceded to be an adaptation of the code reported by the New York Commissioners to the Legislature of that State two years before, but (I

believe) not then enacted. I have compared this with the California and Nevada Codes, and discover no difference in respect to any question arising here. The New York Code Commission were lawyers of distinguished repute, and at least upon questions involved in the subject matter of their official duty, their opinions are entitled to great if not controlling weight. Now, in view of the analogies between our code and the one prepared by the New York Commission, it is a significant fact that the form of indictment in the case at bar fully meets the requirements of a form contained in the report of such Commissioners, and intended to supersede the more complex and common law form then held necessary under the revised statutes of 1828. I will not cumber these pages by giving the old form, but quote from their report the form they deem suffi cient (of course made applicable to the facts of a particular case) under a code of criminal procedure which I have shown has been adopted substantially here. This form is given as follows :

" Court of Oyer and Terminer, of the County of Columbia. *The People of the State of New York* against *John Jones.* John Jones is accused by the Grand Jury of the County of Columbia by this indictment, of the crime of murder committed as follows : The said John Jones, on the first day of January, 1849, at the City of Hudson, in this county, without authority of law, and with malice aforethought, killed William Green by riding over him with a horse."

It has been said that the decisions are conflicting as to matters necessary to be stated in an indictment, yet upon careful examination I think it will be found that, with the exception of the California cases, which I shall presently notice, this conflict is more apparent than real. In probably all of the States, crimes and punishments are defined by statute. In some cases the mode of procedure by indictment is left, as at common law, with the modifications introduced by early English statutes ; in fact, that which may be regarded as the American common law. In other States the statutory changes in respect to the form of an indictment preserve the essential qualities required at common law ; whilst in a few instances, of which California and Nevada are examples, the modifications introduced by their codes have left but feeble traces of the formality and precision requisite at common law. So that when we say that our statute

dividing murder into two degrees is precisely as felonious homicide was by Statute 23, Henry VIII, C. I. Sec. 3, divided into two degrees, (which were afterwards termed murder and manslaughter) or that the Pennsylvania Statute of 1794 is similar to our own in the definition given to murder of the first and second degrees, we shall not fail to notice the differences which were required in indictment and trial of one accused upon such charge under these statutes and our own.   These differences are so perceptible as to render the decisions founded upon them of but little value in determining this question under the code prevailing here.   The author mainly relied upon by defendant's counsel (Bishop on Criminal Procedure) keeps this distinction constantly in view, and illustrates the texts by numerous references in the accompanying notes to the changes which statutes in different States have introduced in this particular.   In California, with a code of criminal procedure as already stated, in all essentials like our own, it is true there is an irreconcilable conflict in the decisions.   Counsel cites several cases from the sixth and ninth volumes of these Reports in support of his views, and undoubtedly to the extent of these authorities he is sustained.   The later cases of *People* v. *Stevenson*, 9 Cal. 273 ; *People* v. *Dolan*, 9 Cal. 576, and *People* v. *Judd*, 10 Cal. 313, in part overrule the principles held in 6 Cal. 208 and 236, and 9 Cal. 31 and 54; and in *The People* v. *King*, 27 Cal. 507, the question is thoroughly and ably considered by the Supreme Court of that State ; and in a more recent case, *The People* v. *Cronin*, (see *Sacramento Union*, Nov. 13th, 1867) it reviews the case of *The People* v. *King*, before cited, and distintly reaffirms the rules stated in its decision in the King case, and therefore these latter decisions must be considered as being the settled law under the code in that State, as to the requisites of a good indictment.   The principles enunciated in these last two California decisions have direct application to the question at issue here, and in my judgment, enunciate the correct rules of construction to be applied in practice under the code.   And it would seem that the reform suggested by the Code Commissioners of New York, and adopted first in the new State of California, and afterwards introduced here, was but the forerunner of a yet more radical change to be introduced into England—the fountain-head of the

common law. From a recent publication (the *American Law Review* for October, 1867) we learn that the form of an indictment for murder now in use there, is as follows :

" Gloucestershire, to wit : The jurors for our Lady the Queen, upon their oath, present that A. B., on the tenth day of July, in the year of our Lord, 1866, feloniously, willfully, and of his malice aforethought, did kill and murder C. D."

Counsel further insists that a constitutional right of defendant's is violated, because the indictment does not conform to the requirement at common law, and founds his objections on a part of Section 8, Article I, of the State Constitution, which provides that no person shall be deprived of life, liberty or property, without due process of law." The same rights are preserved in Article V, of amendments to the Constitution of the United States, which is held to be a restriction of the Government of the United States, and the proceedings of the Federal Courts, and does not apply to the State Governments. But this is of no moment, as we observe the same provision obtains in the State Constitution. It has been universally held, under a like constitutional restriction, that it does not mean " the process "—or otherwise expressed—" the proceeding " shall be the same as pursued at common law, but that the mode and manner of their procedure may be regulated and prescribed by statute. The authority which counsel cites on this point (2 Bishop Crim. Prac., Sec. 585) is not opposed to this principle ; for when the author questions such legislation as being unconstitutional " by reason of its being in conflict with provisions written in the Supreme law," he undoubtedly refers to that part of the Massachusetts Constitution called the Declaration of Rights, Part 1, Article 12, wherein is contained the following provisions : " No subject shall be held to answer for any crime or offense, until the same is fully and. plainly, substantially and formally described to him."

That such was the sense in which the question is considered by the authority cited, there can be no doubt, for he says : " The Constitution of the States differ, and for the present discussion, it will be sufficient to refer to the Constitution of Massachusetts * * *." If our Constitution was in terms like that of Massachusetts, (in New Hampshire the same language is used in their Constitution)

requiring that "a crime or offense shall be fully and plainly, substantially and formally described, to him," I apprehend there could be no doubt that the indictment in this case would be insufficient; and indeed that such constitutional requirement could not be met by an indictment which fell much short of the requisites at common law.

The seventh point—the insufficiency of the evidence to warrant the verdict—is suggestive of a very important question, involving a feature of our Constitution, and one upon which Courts have somewhat differed.  The jurisdiction of this Court on appeal is limited "in all criminal cases in which the offense charged amounts to felony, to questions of law alone."  (Sec. 4, Art. VI, Const.) And the inquiry arises here, to what extent may this Court, and incidentally a District Court, control the verdict of a jury on the ground of an insufficiency of the evidence to justify the verdict. Some authorities hold that in its broadest sense it is a question of law, and the verdict of a jury on these grounds may be set aside; whilst others make a distinction between cases where there is no evidence of a material fact, and where there is some evidence. Greenleaf in his Treatise on Evidence, Volume 1, page 49, says : " Whether there be any evidence or not, is a question for the Judge. Whether it is sufficient evidence is a question for the jury ;" and as we gather, more particularly from the point made by the State's Attorney and the dissenting opinion of two Judges of the Court, this distinction was recognized by the Supreme Court of California in the *People* v. *Jones*, 31 Cal. 505.  This question in the case before us was not argued by counsel, and therefore I am unwilling to pass upon it, as it is not necessary in the ultimate disposition of the appeal, and therefore any question on this point, so far as I am concerned, must be regarded as open for the future ruling of the Court.  If the constitutional objection holds good, that we have no license to award a new trial upon the ground that the verdict is unsupported by the evidence, to which conclusion my present impressions lead me, then the judgment should be affirmed.

On the other hand, if it be a question whether there is any evidence or not in respect to any material fact necessary to be established by the prosecution, I can discover no sufficient reasons why the verdict of the jury should be disturbed.

The only remaining ground of error assigned by counsel, relates to the charge given the jury by the Court below, and refusing certain instructions asked on behalf of defendant. These questions have been most thoroughly and in my judgment satisfactorily answered in the opinion of the Chief Justice, and concurring with him in both his reasoning and conclusions on the point, I must hold the exceptions not well taken. After a careful and protracted examination of the many questions raised by the defense, and enforced by the arguments of counsel of surpassing zeal, industry and ability, I can in no respect discover wherein any substantial right in the defendant under the law has been violated; wherefore I concur in the opinion of the Chief Justice that the judgment be affirmed, and the Court below appoint a day to carry into execution the sentence already pronounced.

Dissenting opinion of LEWIS, J.

The Judge's charge in this case is very lengthy and generally very clear and correct, evincing a thorough understanding of the law of the case; but I find two instructions which do not show the same caution which the balance of the charge exhibits. These instructions are, in my opinion, fatally erroneous, and entitle the defendant to a new trial.

The first of them reads as follows: "The distinction between murder of the first and second degree is quite nice. I will briefly state such distinction; although from the testimony I apprehend you may conclude that the defendant is either guilty of murder of the first degree, or innocent."

In my judgment this portion of the charge is a clear violation of Sec. 12, Art. VI, of the Constitution of this State, which declares that "Judges shall not charge jurors in respect to matters of fact, but may state the evidence and declare the law."

The primary object of this section, doubtless, is to secure to the individual more perfectly and completely those advantages which are supposed to exist in the right of trial by jury; to leave to their uninfluenced judgment the finding of the facts. It has always been the theory that the jury are the arbiters of the facts, whilst the Judge is the expounder of the law.

The State of Nevada *v.* Millain.

---

*Ad questionem facti non respondent judices;* so *ad questionem juris non respondent juratores,* says Lord Coke : " It is the province of the jury to decide the facts and of the Court to decide the law," is an expression which is found stereotyped through the books. It seems to me this expression either means that the jury are the exclusive judges of the fact, or it means nothing at all ; for if the Judge and jury together are to be the judges of the fact, then the duties of the Judge are not properly defined by the expression that it is his province to declare the law, for if he has any voice in the decision of the facts, he not only decides the law, but also the facts.

The theory certainly is and always has been that the jury are the exclusive judges of the facts.   When the Judge, therefore, gives his opinion as to what is or is not sufficiently proven, he steps beyond the limits which the law prescribes for him and invades the province of the jury.   This, it seems to me, is not only the correct theory upon which the right of trial by jury rests, but is the only practice which will give the litigants the full benefit of the cool and deliberate judgment of the jury, who are sworn to decide the issues according to the evidence.   The Judge is not sworn to do so, yet it is well known that his opinion as to the weight of the testimony has a powerful and often a controlling weight with the jury.   His position, character, and learning give to his opinion great weight and influence, whilst in the mere weighing of evidence or judging of the credibility of witnesses, he may be no better qualified than any individual member of the jury.   If therefore the Judge be allowed to give his opinion upon the conclusions of fact to be drawn from the evidence, it is clear the trial by jury would often be a mere mockery. It would be but the ridiculous practice of selecting twelve men to announce the opinion of one.   Upon this subject Graham & Waterman, in their valuable work on New Trials, make some very just and sensible remarks, and fully express my views upon it.

" The Court and jury," says the author, " have separate and totally distinct offices to perform.   Each should confine itself rigidly to its own sphere.   It should never be forgotten that the former is to decide the law and the latter the facts.   The idea that the jury cannot agree upon a verdict unless the Judge imparts to them his notion of what it should be is not only erroneous, but often leads to

great abuse. If the weight of testimony be clearly on one side, any such suggestion from the Judge is unnecessary. If the evidence be conflicting, it is manifestly improper for the Judge to throw his opinion into either scale. If the issue were to be tried by Judge and jury, and not by the jury alone, it would not only be proper but the duty of the Court to make its impression of the evidence both known and felt. As however our Courts are at present organized, the exercise of such an influence is plainly an usurpation and an injury to the party against whom it is employed. The law of a case can be stated and the evidence reviewed and commented upon so as to assist the jury in their deliberations, without improperly influencing or directing them. Further than this Courts are not called upon to go, nor was it ever contemplated that they should." I am fully aware that the decisions of the Courts generally do not support this view of the respective duty of the Judge and the jury. In criminal trials in England the Judges have usually exercised a controlling influence upon the verdict of the jury, and in that way they seldom failed to convict a prisoner who had the misfortune of being obnoxious to the Crown.

Sir William Blackstone, whilst admitting that the English Judges have passed beyond the limits prescribed by the British Constitution, apologises for it as a necessity resulting from the incapacity of jurors to determine the nice and intricate questions which were sometimes submitted to them. He says: " All gentlemen of fortune are, in consequence of their property, liable to be called upon to establish the rights, to estimate the injuries, to weigh the accusation, and sometimes to dispose of the lives of their fellow subjects by serving upon juries. In this situation they have frequently a right to decide, and that upon their oaths, questions of nice importance, in the solution of which some legal skill is requisite, especially when the law and fact, as it often happens, are intimately blended together. And the general incapacity even of our best jurors to do this with tolerable propriety has greatly debased their authority, and has unavoidably thrown more power into the hands of the Judges to direct, control, and even to reverse their verdicts than perhaps the Constitution intended." (1 Black. Com. 8.)

In our own Courts there is a diversity of opinion as to how far

the Judge may go in giving his opinion upon the facts, some of the Courts holding, as in Massachusetts, " that strictly speaking no opinion of the Court on a question of fact is open to exception," whilst other Courts hold that the Judge should give no opinion respecting the conclusion to be drawn from contested facts.   Judge Mills, speaking for the Kentucky Court of Appeals in *Bowman* v. *Bartlett*, 3 A. K. Marshall, declares this rule in the following language :

" The next instruction asked and refused by the Court was, that the defendants had shown no privity and connection between the patents of Innes and their possession.   This was a question requiring the opinion of the Court with regard to some of the facts in the cause, and ought not to have been given if there was any evidence conducing to establish the facts.   The Court is the proper judge of what evidence conduces to establish a fact; but when such evidence is given the Court ought not to express an opinion on its sufficiency, but leave its weight with the jury, except in those cases where the evidence is admitted with all its force, as is sometimes done by a demurrer to evidence, and proceedings of a like nature."

It is observable that the authorities have established no clear and definite line between the province of the Judge and that of the jury in this respect.   But in my judgment that section of the Constitution which is quoted above establishes that line, restores the practice to a closer conformity with the theory, and gives to litigants the right of having the facts in their case decided by a jury uninfluenced by the opinion of the Judge.   This section clearly prohibits the Judges from giving their opinion upon any contested fact in the case, or saying to the jury what may or may not be sufficiently proven.   Thus the jury, who theoretically have always been considered the judges of the fact, are practically made so.   They who are sworn to decide the issues between the parties according to the evidence are thus left entirely free to determine the fact as their judgment may dictate, uninfluenced by any consideration but the evidence in the case.   If there be any reason why the jury should not be influenced by the opinion of the Judge upon matters of fact, given as a direct charge, surely the same reason exists against such influence, though exercised by a mere insinuation or

intimation of opinion; for, as I have already said, a mere intimation of opinion by the Judge often makes as much impression upon the jury as a positive direction to find in a certain way. If the object of the Constitution be to remove the jury beyond the influence of the Judge in the decision of matters of fact, (and I think such to be the object) the manner in which that influence may be exerted is certainly a matter of no consequence, whether it be by a direct and positive instruction as to what may be established by the evidence, or by the simple intimation of an opinion. It seems to me, therefore, that the spirit of the Constitution as peremptorily prohibits the intimation of an opinion by the Judge as to what may or may not be sufficiently proven, as a direct charge to that effect.

But the Judge below in this case gave it as his opinion to the jury that the testimony established one of two facts: either that defendant was guilty of murder in the first degree or that he was innocent. Thus his opinion is given to the jury that the evidence did not justify a conviction of murder in the second degree. That may have been a fact. The Judge may have drawn the correct conclusion from the evidence, but he was not to decide whether the evidence established murder in the first or murder in the second degree. That is made a question of fact to be decided by the jury; Section 17, Laws of 1861, p. 59, declaring that "the jury before whom any person indicted for murder shall be tried shall, if they find such person guilty thereof, designate by their verdict whether it be for murder of the first or second degree."

Here, then, the Judge below charged the jury as to a matter of fact; gave it as his opinion that if the defendant committed the homicide it was a willful, deliberate, and premeditated killing—that is, murder in the first degree. Where the homicide is not committed by means of poison, lying in wait, or torture, or in the perpetration or attempt to perpetrate arson, rape, robbery, or burglary, (in all these cases it being expressly made under the first degree) the degree of the offense depends entirely upon the question whether the killing was willful, deliberate, and premeditated. In other words, whether the killing was the result of a deliberate intent to take life.

The degree of the crime is a question which is not only to be

stated in the verdict, but which must, like any other fact, be estab
lished by the evidence. Therefore, to justify a conviction of mur-
der in the first degree, it must be shown that there was an intent to
kill—to show such a state of facts or circumstances as will negative
a killing without the deliberate intent or purpose to kill, but which
at common law would be murder. At common law, any killing
which results from any unlawful act, the probable consequence of
which is death, is deemed murder, although the killing was not pre-
viously intended, as the cases put by Blackstone of " an unnatural
son who exposed his sick father to the air against his will, by reason
whereof he died ; of the harlot who laid her child under leaves in
an orchard, where a kite struck it and killed it; of the parish
officers who shifted a child from parish to parish till it died for want
of care and sustenance."

And so if a man throw a heavy body from the roof of a building
into a crowded street, by means of which a person is killed, it is
murder, though there was no intent to kill.

But in none of these cases would the homicide be murder in the
first degree under our statute, because of the absence of the delib-
erate intent to kill. To warrant a conviction, therefore, of murder
in the first degree (where it is not committed in the perpetration
or attempt to perpetrate robbery, etc.) the evidence must be such
as to negative any presumption of a killing without a deliberate
intent to do so ; or rather a deliberate intent or purpose to kill
must be proven by the prosecution. (Wharton's Criminal Law,
1083.)

The statute declares that only willful, deliberate and premedi-
tated killing, or that which is perpetrated by means of poison,
lying in wait or torture, or which is committed in the perpetration
or attempt to perpetrate arson, rape, robbery or burglary, shall be
murder in the first degree ; that all other kinds of murder shall be
deemed murder in the second degree. To convict of murder in the
first degree it is therefore as necessary for the prosecution to show
in a case of this kind that the killing was willful, deliberate and
premeditated, as it is to establish any other fact. And it must not
only be proven, but it must be established beyond a reasonable
doubt. If there be a reasonable doubt whether such deliberate

31

intent to kill existed, the prisoner should have the advantage of the doubt and the jury should find him guilty of the lower grade of the crime. This reasonable doubt is as available to reduce the degree of the offense as to acquit entirely. (1 Wharton's American Criminal Law, 710 ; Id. 944.)

It may be said that the killing being shown, the law would presume it to be murder. Such is the presumption, but it is not presumed to be murder in the first degree. The mere homicide, independent of the manner of the killing, would doubtless only raise the presumption of murder in the second degree. As murder may be committed in innumerable ways, without the deliberate and premeditated intent to kill, the mere fact of the killing should not raise the presumption that such deliberate intent to kill existed. It has been held in Virginia and Ohio, that where the homicide is proven the presumption is that it is murder in the second degree. That if the prosecutor would make it murder in the first degree, he must establish the characteristics of that crime, and if the prisoner would reduce it to manslaughter the burden of proof is on him. (1 Wharton Criminal Law, 1111.) The deliberate and premeditated attempt to kill, which the statute makes a necessary ingredient of this crime, can it seems to me only be ascertained in one of two ways—either by the express declarations of the prisoner, or from the manner of the killing and the circumstances connected with it. Where the killing is not proven by an eye witness, and the manner of killing is gathered only from the wound or wounds upon the body, it is clear that it would in a majority of cases be very difficult to show, beyond a reasonable doubt, that the homicide was committed with a deliberate intent to kill. If it appeared that the mortal wound was inflicted with an instrument likely to produce death and upon a vital part of the body, that would perhaps be sufficient to warrant a conviction of murder in the first degree ; but it would not by any means be conclusive, because it might have been inflicted in self defense, or upon a sudden quarrel, or in the reckless attempt to inflict some bodily harm, in all of which cases the crime would only be murder in the second degree.

Take the case at bar, what evidence is there that the killing was willful, deliberate and premeditated ? Simply the manner in which

the life of the deceased was taken, the presumption being that death produced by choking or strangling must have been the result of a deliberate intent to kill; such would be a natural presumption, and one sufficient, perhaps, to justify a conviction of murder in the first degree.   Killing produced by such means might have satisfied the jury beyond a reasonable doubt of the premeditated intent to kill, but surely such fact would not conclusively establish it.   Is it not possible that a quarrel may have occurred between the defendant and the deceased, and that in the heat of such a quarrel death might have been the result ?   Had such been the case it would not necessarily be murder in the first degree.   Or suppose there had been no quarrel, but the defendant went to the house of the deceased with the intent and purpose of inflicting bodily punishment upon her, and in doing so choked her beyond his purpose.   In such case the crime would not be murder in the first degree, because it would not be the result of a deliberate intent to kill.   True, the proof in such case might be overwhelming and convincing that such was the intent.   Admitting it to be so, yet as it is a fact to be determined by the jury, and of the existence of which they are to be satisfied beyond a reasonable doubt, and upon which it is possible they may have such doubt, the Judge transcends his power when he tells them that such fact is established by the evidence, as was virtually done in this case. To give it as his opinion to the jury that the defendant was either guilty of murder in the first degree or innocent, was simply saying that the evidence established the homicide to have been a willful, deliberate and premeditated killing, which was a fact incumbent upon the prosecution to establish, and which could only be determined by weighing all the testimony in the case.   Had the Judge below told the jury that the evidence fully showed that the defendant committed the crime, it would hardly be claimed that it would not be a violation of the Constitution.   That it would not be " charging as to matters of fact," and yet the deliberate intent to kill, is a fact as necessary to be proven by the prosecution as the proof that the defendant occasioned the death of deceased.   How was the fact that a conviction of murder in the second degree was not justified by the evidence to be ascertained ?   Only by assum-

ing that the deliberate and premeditated intent to kill was proven beyond a reasonable doubt. The jury might possibly have had some doubts upon that question. They may have been well satisfied that the defendant took the life of the deceased, and being satisfied of that, the law justified them in the presumption that the homicide was murder; but they may not have been satisfied beyond a reasonable doubt that the killing was the result of a deliberate and premediated intent or design to take life, and if they were not they should have found him guilty of the higher degree. Thus the Judge not only charged the jury as to a matter of fact, but assumed and gave it as his opinion that such fact was proven beyond a reasonable doubt, whilst the jury might have drawn a different conclusion from the evidence.

Had the homicide in this case been committed by means of poison, or in the perpetration or attempt to perpetrate arson, rape, robbery or burglary, possibly it would not be deemed error in the Court to say to the jury that they could only find defendant guilty of murder in the first degree or acquit him, because the law absolutely makes all homicide committed in that manner murder in the first degree; and when the prosecution establishes the fact that it was committed in any of these ways, the burden of reducing the crime devolves upon defendant if such thing were possible. If for example it was shown by the prosecution that the killing was committed by means of poison, and there was no attempt to show a killing by any other means, the Court might say that there was no evidence to reduce the crime to murder in the second degree, without, perhaps, violating the constitutional provisions. At least, it has been held in California upon a Constitution similar to ours, that when the killing is proven, and there is no attempt upon the part of the prisoner to reduce the offense to manslaughter, it is not error for the Court to instruct the jury that they are not to consider the question of manslaughter. That would, however, be a very different case from this. In that case the Court simply tells the jury that the defendant has introduced no evidence to reduce an act, which in contemplation of law is murder, to manslaughter, the burden of proving which is always thrown upon the defendant after the homicide is established by the prosecution. Under its right

to state the evidence, the Court might perhaps say that there was no evidence to establish a certain fact, if such were indeed the case. I do not, however, say that even that might not possibly be considered error. But in this case, the Court tells the jury that a fact, which it was the duty of the prosecution to establish beyond a reasonable doubt, was so established. That is giving an opinion upon the weight and sufficiency of evidence, not a statement that there is no evidence to establish a fact. It is not charged in the indictment, nor is it claimed by counsel, that the murder in this case was committed by means of poison or in the perpetration of, or attempt to perpetrate arson, rape, or robbery; and as there is no proof that it was so committed, the degree rested solely upon the question whether it was proven beyond a reasonable doubt that the homicide was the result of a deliberate and premeditated intent to kill. Whether it was or not, the jury were the exclusive judges, and therefore the Court erred in giving the instruction set out above.

The other instruction, which in my opinion is open to the same objections, reads as follows:

" The testimony in this case tends to show the property of the deceased, or some portion of the same, in the possession of the defendant at a time subsequent to the alleged murder, and at quite a recent date."   *   *   *

This instruction assumes that the property found in the possession of the defendant was the property of the deceased. That was a question upon the establishment of which alone the defendant could have been convicted. It will be observed that the Court does not say that the evidence tended to show that the property found in the possession of the defendant belonged to the deceased; but assuming that the property did belong to the deceased, the Court says the evidence tends to show simply one fact—*i. e.*, that it was in the defendant's possession subsequent to the murder. Whether the property found in possession of the defendant belonged to the deceased, was a question of fact to be ascertained by the jury. However, as the first instruction discussed is in my opinion sufficient to reverse the judgment in this case, I do not deem it necessary to give this any further consideration.

The State of Nevada *v.* Millain.

As the swift and certain administration of criminal justice is the surest preventive of crime, and the strongest guarantee of public order, any circumstance which has a tendency to delay or defeat it is greatly to be regretted. But however deeply we may deplore any such circumstance, it is the first and paramount duty of the citizen to respect, and of the Court to vindicate, the law. It should not be forgotten that even to the most abandoned and reckless felon, charged with the most heinous and most revolting crime, the law guarantees rights which no man has a right to take from him ; which no Court can conscientiously disregard. Though the proof of his crime be overwhelming and conclusive—though there be nothing to mitigate his crime, no circumstance to plead for mercy, no legal technicality to obstruct the keen point of the sword of justice—yet it is only upon a presentment or indictment of a Grand Jury that he can be called upon to answer for his crime ; he can only be found guilty by the verdict of an impartial jury, and executed or punished only upon a regular judgment of a Court having complete jurisdiction ; in other words, the criminal has a right to claim that justice shall only be meted out to him in exact accordance with the strict and inflexible rules of law. It is his right to have the law governing his case clearly and correctly expounded to the jury ; notwithstanding the proof of his guilt may be perfectly conclusive, yet any material error in so stating the law entitles him to a new trial. That may not be a good rule, but *ita lex scripta est.*

The law, in its humanity, presumes every man innocent until his guilt is established according to the rules adopted for that purpose. Until his guilt is so established, therefore, the strong arm of the law shields and protects him as it does the most pure and upright citizen in the community.

In my judgment a new trial should be awarded.

---

RESPONSE TO PETITION FOR REHEARING.

Opinion by BEATTY, C. J., JOHNSON, J., concurring.

A petition for a rehearing has been filed in this case, and three points are relied on in that petition. Those points are as follows :

1st. That this Court erred in sustaining one of the instructions given by the Judge in the Court below.

2d. That the indictment was bad because, when our Constitution was adopted requiring that " No man shall be prosecuted for a capital or otherwise infamous crime, except upon indictment or presentment," etc., the word indictment was used in its common law signification, and meant what it meant at common law and not what it might be made to mean by subsequent enactment.

3d. That the examination of D. Black showed that he was not a competent juror, and not capable of rendering an impartial verdict.

We will examine the objections in their reversed order. With regard to the third point, it was fully discussed both in oral argument and the written brief of appellant's counsel. The objection was carefully examined by this Court, and we were unanimously of the opinion the juror was not disqualified, and we see no reason to change that opinion. No new light is thrown on the subject.

The second point was argued with great ability by counsel on the first hearing of this case. His brief was certainly very full on this point, and we read with great care and attention the arguments of Mr. Bishop as to the necessity of an indictment for murder drawing the distinction between murder of the first and second degree. We examined all the authorities cited by counsel, with many others not referred to ; and after a very careful examination of this point, the Court was satisfied of the sufficiency of the indictment under our statute upon the subject.

The counsel, in his petition for rehearing, presents no new argument on this point. He perhaps lays more stress now than he did in his first argument, upon the proposition that the word indictment, as used in our State Constitution, must be understood to have meant an indictment as that word is understood at common law. This view of the case was under consideration, but on mature reflection we could not come to the conclusion that appellant's counsel seems to think should have been arrived at. When the Constitution of the United States was adopted, it only required a person before being put on his trial for a capital, or other infamous crime, to be presented or indicted, showing that the formality of an indictment might be dispensed with if the grand jury acted by presentment.

In other words, that it was only necessary that the grand jury, in some form, should sanction the proceeding before a party should be put on his trial.

If it was meant to require a common law indictment, what was such an indictment? Before the Norman conquest, I am not certain what language was used in law proceedings, probably either Latin or Anglo Saxon, in most parts of England; in other parts, probably either the Danish or Welsh language. After the conquest of England by the Normans, all legal proceedings were either in Norman, French, or Latin. The older forms of indictment with which we have any particular acquaintance under the common law system were in Latin. But the Latin forms had been abolished in England before we adopted our Federal Constitution. Certainly it was not the intention of the Convention who formed our Constitution to reintroduce the obsolete Latin form of indictment. If they did not intend to reëstablish the old Latin form, how are we to know that it was the intention to require any particular form for our indictment. Even if the framers of that instrument had used the single term indictment, without connecting the other and more latitudinous term presented with it, would it not be more rational to conclude they only meant that, before a party was put on his trial for a certain class of offenses, a " grand jury legally convoked," should upon their oaths prefer a written charge against him, stating the nature of the acts done and the crime of which he was accused, leaving the form of that charge and the language in which it was to be stated to be regulated by law, as it heretofore had often been. That this was their intention, is we think, clearly shown by the use of the word presentment in connection with the term indictment.

That this was the view taken by the framers of our own Constitution there is less reason to doubt. We have copied most of our Constitution and most of our laws from the sister State of California. Long before the adoption of our Constitution that State had passed laws simplifying, shortening and omitting many of the more formal parts of the old fashioned indictments. These more simple and less formal indictments had often been sustained by the Courts of California, and also by the Territorial Courts of Nevada. It could not

have been the intention of the framers of our Constitution to compel this State to go back to the old and almost obsolete form of the common law indictments.

We see no reason for changing the views we first expressed on this point.

The remaining point in the petition for a rehearing which we deem it necessary to notice, is in regard to one of the instructions complained of., That instruction is in the following language : " The distinction between murder of the first or second degree is quite nice.   I will briefly state such distinction, although from the testimony I apprehend that you may conclude that the defendant was either guilty of murder of the first degree, or innocent."

The complaint is that the jury were instructed as to matters of fact, when the Constitution provides that they alone shall be the judges of fact ; in other words, that the Court usurped the province of the jury in expressing an opinion as to matters of fact.   Whilst judges are prohibited from charging juries in respect to matters of fact, they are authorized to " state the testimony."   It may be doubtful as to what is the exact meaning of this latter expression. It was hardly intended to confine the Judge, in stating the testimony, to a parrot-like repetition of what the witnesses said.   For such a purpose the wisest Judge would be less competent than a good phonographic reporter.   It must surely have been intended to allow the Judge some latitude in commenting on the testimony he was stating.   If not, it was foolish to say he should state it.   If the Judge may comment on the testimony given, what character of limitation will you place on those comments ?   That he may weigh the evidence and comment on it, point out the discrepancies in the testimony on either side, show where one piece of evidence corroborates another, or where the testimony of two or more witnesses contradict or conflict with one another, is generally admitted.   As we stated in our former opinion, it is admitted that the Judge may in many cases determine that there is no evidence to support a given proposition.

On this ground nonsuits are granted in civil cases, and juries directed or advised to acquit in criminal cases.   It has certainly been held in some cases that the opinion of the Court expressed as

to the weight or sufficiency of evidence on any given point was not error.   On the other hand, it has been held that it would be error where there was any conflict of evidence for the Court to say to the jury that a certain fact was or was not proved.   But there is a great difference in the two propositions.   In the first the Judge only gives his opinion and advice, still leaving the jury perfectly free to find the fact as they think right, only giving to the advice and opinion of the Judge such weight as it is entitled to.   In the other they are imperatively commanded to find a fact in a certain way, or in making up their verdict to consider that particular fact as fully established.

The case of *The Commonwealth* v. *Child*, 10 Pick. 252, establishes the first proposition.   The case cited by Mr. Justice Lewis in his opinion in this case from 3 A. K. Marshall, is one wherein the Court below was asked to instruct the jury positively that a certain fact had not been proved, when in fact certain evidence had been given tending to show that fact.   The Court refused to give the instruction, and the appellate Court held the ruling correct.   But that Court in expressing their views of the law use language going far beyond the case before them.   They go farther and say the Court should not even express an opinion in regard to a fact where there is a conflict of evidence.   But where an opinion goes beyond the case before the Court it amounts to a mere *dictum*.   So far as this case goes it only establishes the second proposition we have stated, which is not necessarily in conflict with the Massachusetts case.   The *dictum* (which is probably the mere result of carelessness) certainly is in conflict with the case in 10 Pick.

In the case of the *People* v. *Ybarra*, 17 Cal. 166, the defendant was indicted for the murder of a woman.   There was evidence, and among other things the dying declarations of the murdered woman, that she was murdered by Pedro, a man with whom she had been living.   But the defendant who was on trial was not arrested until the lapse of a considerable period after the offense committed, and his main reliance before the jury was that he was not the Pedro who had lived with the woman.   In other words, there was a question as to the identity of the defendant, whether he was the Pedro Ybarra who had formerly lived with the murdered woman, or was

a different man unfortunately bearing the same christian name, (Pedro) and a close personal resemblance to the former companion of the murdered woman.   These facts do not distinctly appear in the reported case, though it is clear from the opinion of the Court that some question of this kind was raised in the case.   The writer of this opinion having been of counsel, recollects the main features of the case distinctly.   A witness in that case gave in evidence the dying declaration of deceased, and swore that he recognized the defendant as the Pedro with whom deceased had lived, and of whom she spoke in her dying declarations.   The Court instructed the jury that if they believed the dying declarations of deceased were true they must convict the defendant.   This took from the jury the right to exercise any judgment as to the sufficiency of the proof as to the identity of the prisoner with the other Pedro.   Of course this was wrong under all rules.   This does not conflict with the Massachusetts case.

Some general rules seem to be tolerably well established as to how far a Judge may go commenting on evidence and giving his opinion thereon.   The general result seems to be, that a Judge may express his opinion on the weight or sufficiency of evidence if he is careful to inform the jury distinctly, that whilst he as Judge may comment on the evidence and give his opinion as to its effect and sufficiency to prove any given fact, yet they are the ultimate judges of the fact, and may find according to their own views of its sufficiency, even though it be contrary to the opinion of the Court.   This view of the law is sustained by a multitude of authorities, and perhaps none is more directly in point than the case of the *N. Y. Fire Insurance Co.* v. *Walden*, 12 John. 513.   Those wishing to further investigate this subject will find many cases cited by Graham & Waterman, in their work on New Trials, vol. 1st, 310 *et seq.*, and also at page 825 *et seq.*, in vol. 3d (the paging of volumes two and three being continuous).   There are some *dicta* to the effect that a Judge ought not to express his opinion about matters of fact in the presence of the jury, and Graham & Waterman, whilst admitting that the rulings have been to the contrary, seem to think that Judges in this democratic country ought not to trespass on the province of the jury by expressing an opinion on matters of fact.

We cannot find a single case where a new trial has been granted because of a mere expression of opinion of a Judge, unless in cases where the Appellate Court has held the Judge was clearly wrong in the opinion expressed. There the case has been reversed, not merely because of an expression of opinion, but because the jury seemed to have been misled by a wrong opinion, for if the jury found according to the force of the evidence, notwithstanding the bad instruction, the case would not be reversed by the Appellate Court.

Here it is complained the Judge intimated an opinion that the jury ought not to convict of murder in the second degree. Was not this intimation clearly correct? There was no testimony tending in the slightest degree to convict the prisoner of any such offense. It is urged by counsel that it might be true that the prisoner killed the deceased, yet was not guilty of murder in the first degree; that he may have killed her upon some sudden quarrel and afterwards perpetrated the robbery. That is possible, but there is no testimony tending to prove it, nor is there any evidence adduced on the trial showing a reasonable probability that such may have been the case. The killing was by choking. To kill in this way requires time and a continuous exertion which at best strongly tends to negative the idea that it was done in a sudden heat of passion, or that it was the unexpected result of what was only intended to be chastisement, or injury of a character not expected to produce death. Again: the robbery followed the death of the woman almost immediately, for she was alive late at night and in the morning she was found dead and the goods were gone. Judging by experience of the conduct and actions of other criminals in similar circumstances, we can hardly conceive that if the murder had been the result of hot blood or accident, the murderer would have had the hardihood to remain in the house long enough to rob it. He would have fled to conceal his guilt, or have given himself up to some officer, trusting by a prompt surrender and statement of his own case to palliate or excuse the crime. We apprehend that the deliberation required to effect the robbery must have been the result of a well matured plan either to murder and rob, or at least to plunder the house, and to murder if necessary in carrying out the main object.

We can see no evidence in the case upon which the jury might have found the prisoner guilty of murder in the second degree. Had they so found, we would have been forced to the conclusion that the jury had either compromised with some obstinate member, compromised with their own conscience, (being doubtful of the guilt of the prisoner) or else, taking the law-making power into their own hands, said this man shall be only imprisoned, although the law declares that for such an offense death shall be the penalty.

The rehearing is denied.